Hillsborough
No. 80-323

TOWN OF WEARE

v.

ESTATE OF ARTHUR W. PAQUETTE & a.

ESTATE OF ARTHUR W. PAQUETTE & a.

v.

ALICE EDMUNDS & a.

August 5, 1981

*Brighton, Fernald, Taft & Hampsey P.A.*, of Peterborough (*Silas Little, III*, on brief and orally), for the Town of Weare.

*Malloy & Sullivan*, of Manchester (*James J. Barry, Jr.*, on the brief and orally), and *Larson & Pletcher*, of Londonderry (*Bruce R. Larson* on the brief), for the Estate of Arthur W. Paquette and Marguerite F. Paquette.

*John E. Palmer, Jr.*, of Weare, by brief and orally, for Alice Edmunds.

*Hatfield & Henderson P.A.*, of Antrim (*Lloyd N. Henderson* on the brief and orally), for Douglas S. Hatfield, Jr.

PER CURIAM. This appeal involves two separate actions to determine the rights of the various parties to a parcel of land in Weare. The parcel is roughly triangular, bounded on the east by Route 77 and on the west by Oak Hill Road, with the two highways coming together to form an inverted "Y" at the north end of the property. At the apex of the triangle on the north end of the property are a house and connected barn.

In 1944 Bertha Butler acquired the property in question, and she lived there until she died in 1974. Attorney Douglas Hatfield was appointed administrator of the estate. The property was put up for sale at a public auction held on October 14, 1974, and was ultimately purchased by Arthur and Marguerite Paquette. Sometime prior to the signing of the purchase-and-sale agreement, Alice

Edmunds contacted Attorney Hatfield to inform him that she owned an unspecified portion of the property.

Alice Edmunds lives in a schoolhouse that lies at the south end of the property. The school was built sometime in the mid-nineteenth century, but there was no evidence of any conveyance to the Weare school district. The school was closed before 1933, and from 1934 to 1942 Mrs. Edmunds and her now deceased husband leased the schoolhouse from the Town of Weare. In 1942, the Edmundses purchased the building from the Weare school district, receiving a quitclaim deed that conveyed the "Dearborn Village School-House . . . with all the privileges and appurtenances thereunto belonging . . . ."

Because the extent of Mrs. Edmunds' interest in the property was undetermined, the Paquette purchase-and-sale agreement was modified by excluding "the School House Lot," and by adding provisions that the seller would guarantee a marketable title and have the boundaries established. The question of Mrs. Edmunds' interest in the property was never resolved, and Attorney Hatfield conveyed the property to the Paquettes by fiduciary deed dated November 15, 1974, using the description in the deed by which Bertha Butler had acquired title.

Shortly after the Paquettes purchased the property, they placed a series of obstructions in a gravel roadway at the north end of the lot that had been used as a cut-off between Route 77 and Oak Hill Road. In response, the Town of Weare brought a petition to enjoin the Paquettes from obstructing the cut-off, which the town claimed was a public right-of-way by prescription. The Paquettes then brought a petition to quiet title against Alice Edmunds and Attorney Hatfield.

The two actions were consolidated for trial in the superior court. After a three-day trial, which included a view, the Master (*Charles T. Gallagher*, Esq.) issued a report in which he made certain findings of fact and recommended that the court issue a decree enjoining the Paquettes from interfering with the public right-of-way in the cut-off, quieting title in a parcel of land known as the "Schoolhouse Lot" in Alice Edmunds, dismissing the Paquettes' and Edmundses' claims for damages against each other, and rendering judgment for Douglas Hatfield. The Superior Court (*Flynn*, J.) approved the master's report and entered a decree in accordance with it.

The Paquettes filed a motion to set aside the verdict, upon which the master held a hearing. The master issued a second report, proposing certain amendments to the initial report and recom-

mending that the motion be denied. *Bean*, J., approved that report. The Paquettes then brought this appeal.

We first consider the Paquettes' arguments concerning the master's finding that the cut-off was a public right-of-way established by prescription. They argue that there is insufficient evidence to support the master's finding. We disagree.

■ In order to establish a prescriptive right-of-way, the town was required to show "twenty years' adverse, continuous, uninterrupted use of the land . . ." in question. *Arnold v. Williams*, 121 N.H. 333, 334, 430 A.2d 155, 156 (1981); *Williams v. Babcock*, 116 N.H. 819, 823, 368 A.2d 1166, 1170 (1976). No less than five long-time residents of the town of Weare testified that they had used the cut-off themselves and had observed others use it since at least 1934 and that the road had never been closed to the public until the Paquettes erected barriers in 1975. Several of the residents also testified to town maintenance of the cut-off. This evidence supports the master's finding that the cut-off had become a public way by prescription by the time the Paquettes tried to block its use.

The Paquettes do not seriously dispute that there has been twenty years' continuous and adverse use of the cut-off but rather argue that there is insufficient evidence to establish the exact location of the right-of-way. In support of that contention, they rely on the testimony of Weare's road agent from 1960 to 1975, who stated that sometime in the late 1960's or early 1970's he did road work on the cut-off and, by agreement with Mrs. Butler, moved the original path. They also cite the master's equivocal finding that, "[t]he location of the old cut-off is not readily apparent, but . . . it probably lay within the area described in the recommended decree."

■ ■ It is true that in order to establish a highway by prescription the town was required to show public use along a definite and specific line of travel. 39A C.J.S. *Highways* § 6 (1976); 2 G. THOMPSON, COMMENTARIES ON THE MODERN LAW OF REAL PROPERTY § 342, at 214 (1980). But slight deviations in the line of travel do not defeat the town's claim. 39A C.J.S. *Highways* § 6 (1976); *cf. Hoban v. Bucklin*, 88 N.H. 73, 79, 184 A. 362, 366 (1936). The Paquettes have not alleged, nor is there any evidence in the record, that the public's line of travel deviated substantially in the period between the early 1930's and the 1960's. By 1960 the public's right to use the cut-off had already been established. *See* RSA 230:1. The location of the road was changed after that time by agreement with Mrs. Butler, then the owner of the property. The Paquettes

are estopped from challenging the location of the cut-off, based upon their predecessor in title's agreement. *See* 39A C.J.S. *Highways* § 6 (1976).

■ The Paquettes also allege that the master erred in admitting into evidence a 1907 photograph showing the cut-off which could not be authenticated and which did not show the location of the cut-off in relation to the house. Assuming *arguendo* that admission of the photograph was error, such error was not prejudicial because the evidence was merely supportive or cumulative. Accordingly, we find that the master's determination that the cut-off was a public way established by prescription is supported by the evidence and not erroneous as a matter of law. *See Summit Electric, Inc. v. Pepin Brothers Const., Inc.*, 121 N.H. 203, 206, 427 A.2d 505, 507 (1981).

We next consider the Paquettes' appeal of the trial court's decree quieting title to the "Schoolhouse Lot" in Mrs. Edmunds. The court's decree was based on the master's finding that Mrs. Edmunds had gained title to the lot by adverse possession. Accordingly, we need address only those arguments relative to that finding and need not concern ourselves with the Paquettes' arguments about the validity of deeds from the Town of Weare and from the Weare school district.

■ ■ In order to sustain her claim of title by adverse possession, Mrs. Edmunds was required to show twenty years' "adverse, continuous, uninterrupted use of the land" she claimed. *Hewes v. Bruno*, 121 N.H. 32, 33, 424 A.2d 1144, 1145 (1981) (quoting *Page v. Downs*, 115 N.H. 373, 374, 341 A.2d 767, 768 (1975)). She was required to show that the nature of her use was sufficient to put the owner on notice that an adverse claim was being made to the property. *Id.* The record demonstrates that, from 1942, the Edmundses treated the property as if it were their own. They maintained the premises, made improvements, and even purchased an adjacent parcel of land on which to build a garage. The Weare road agent testified that when he did construction work on Oak Hill Road in the late 1960's he asked Mr. Edmunds' permission about changes to his driveway. Mrs. Butler's niece, Katherine Samuels, testified that her father, Mrs. Butler's predecessor in title, asked permission of the Edmundses to plant a garden in an area between the schoolhouse and the Butler house. All of that evidence reinforces the master's finding that, from 1942 to 1974, the Edmundses claimed the property as their own and used it in such a way that others would understand that an adverse claim was

being made. *See generally* 5 G. THOMPSON, COMMENTARIES ON THE MODERN LAW OF REAL PROPERTY § 2546 (1979).

The Paquettes also question the manner in which the master determined the boundaries of the "Schoolhouse Lot." They argue that, prior to the time Henry Amsden drew up a plan for the Town of Weare, there was no such thing as a "Schoolhouse Lot." A sketch of what is shown on the Amsden plan is attached to this opinion, for illustrative purposes only. The record, however, contains the testimony of Gordon Osborne, who went to the Dearborn School in the early 1900's, and who recalled that the schoolyard was clearly delineated, and that the students were not allowed to go beyond the indicated boundaries. When shown the Amsden plan, Mr. Osborne stated that the area depicted as the "Schoolhouse Lot" was a fair representation of the schoolyard as he remembered it. Mrs. Edmunds also testified that the plan outlined the area she thought she had purchased in 1942 when she received a deed to the schoolhouse. This evidence is sufficient to support the master's finding as to the area occupied and claimed first by the school district and then by Mrs. Edmunds. *See* 3 AMERICAN LAW OF PROPERTY. § 15.3(b) (A. Casner ed. 1952).

■ The master's finding that Mrs. Edmunds acquired *only* the "Schoolhouse Lot" by adverse possession is supported by Mrs. Edmunds' testimony that, although she used the area behind the schoolhouse, she did so with Mrs. Butler's permission. In other words, although her use of the area behind the schoolhouse may have been the same as that throughout the rest of the yard, she used it with the owner's permission, and not adversely. That use, therefore, could never ripen into title by adverse possession. *Arnold v. Williams*, 121 N.H. at 334, 430 A.2d at 156.

The Paquettes also argue that the trial court erred in refusing to admit into evidence testimony regarding a conversation in which Lillian Gladden, who was deceased at the time of trial, stated that she knew that her aunt, Mrs. Butler, gave the Edmundses permission to live in the schoolhouse. The master excluded the evidence except for rebuttal purposes on the ground that it was hearsay and did not fall within any exception to the rule. Relying on *Piper v. Fickett*, 113 N.H. 631, 312 A.2d 698 (1973), the Paquettes argue that the statement is admissible as a statement of a deceased person.

Any testimony of a conversation with Lillian Gladden would be double hearsay because her knowledge of Mrs. Butler's alleged agreement with the Edmundses would itself be derived from hearsay. *See State v. Scarlett*, 121 N.H. 37, 42, 426 A.2d 25, 28 (1981).

■ Whether testimony is admissible as an exception to the hearsay rule is for the trial court to determine, *State v. Hudson*, 121 N.H. 6, 11, 425 A.2d 255, 257 (1981), and we will not disturb such a determination unless we find it to be clearly erroneous. *Id.* In this case, the master refused to admit the statement into evidence because it was self-serving. Lillian Gladden was an heir of Bertha Butler. Any statement she made that her aunt gave Mrs. Edmunds permission to live in the schoolhouse would be in her best interest because it would enlarge the estate. The master, therefore, could have found that the statement lacked "the characteristics of trustworthiness and reliability that . . . [justify] its admission as an exception to the hearsay rule." *State v. Ebelt*, 121 N.H. 143, 146, 427 A.2d 29, 31 (1981); *see Piper v. Fickett*, 113 N.H. at 632, 312 A.2d at 699. We find no error in the master's assessment of the statement and his consequent refusal to admit it into evidence.

Next we address the Paquettes' argument that the master erred in finding that their suit against Attorney Hatfield was frivolous. From the pleadings, we glean that they brought suit against Attorney Hatfield for his failure to establish the boundaries of their property, as he agreed to do in the purchase-and-sale agreement. As damages, the Paquettes sought the cost of hiring their own surveyor to establish boundaries. The master found, however, that the Paquettes, through their previous attorney, Mr. Eaton, had waived that requirement when they accepted the deed that contained the same description as the Butler deed. That finding is supported by Attorney Hatfield's testimony. Although Mrs. Paquette testified that she never waived that requirement, the master was free to resolve the conflict in testimony in favor of Attorney Hatfield. *Murphy v. Bateman*, 121 N.H. 748, 750, 433 A.2d 1330, 1332 (1981).

■ The fact that such a conflict in the testimony existed, however, leads us to conclude that the Paquettes' suit against Attorney Hatfield was not frivolous but was based on a valid dispute over who was required to establish the boundaries. The master's finding that "[t]he case against Mr. Hatfield was frivolous after Mrs. Paquette's evidence was assembled for presentation at trial, including her own testimony which substantiated Mr. Hatfield's testimony in every important respect . . ." is clearly erroneous. We therefore reverse the master's finding that the Paquettes' suit against Attorney Hatfield was frivolous, but we will not overturn the master's resolution of the dispute in Attorney Hatfield's favor.

Finally we consider the Paquettes' argument that the master erred in refusing to grant their motion to set aside the verdict and order a new trial. The basis for the motion was that, after the initial decree issued, the Paquettes contacted Attorney Eaton, who indicated that he had never waived the requirement that the seller establish the boundaries. They have submitted a signed statement by Attorney Eaton to that effect.

 It is within the trial court's discretion to decide whether to grant a new trial based on newly discovered evidence. *State v. Kelly*, 120 N.H. 904, 906, 424 A.2d 820, 822 (1980). The moving party must establish that he was not at fault in failing to discover the evidence at the earlier trial. *Id.* The evidence offered by the Paquettes does not meet this requirement. At a deposition held almost three years before trial, Attorney Hatfield described his efforts to establish boundaries. He testified that he attempted to arrive at a boundary settlement with the Paquettes through their attorney and that, when the parties were unable to reach an agreement, he offered to convey "exactly what I got, by the exact description in my decedent's deed." He stated that Attorney Eaton agreed to that proposition and that it was acceptable to Mr. Paquette to the best of his knowledge. The Paquettes, therefore, were put on notice long before trial that Attorney Hatfield understood that his obligation to establish boundaries was waived by the Paquettes' acceptance of the deed containing the same description as the Butler deed. We find no abuse of discretion in the master's refusal to grant a new trial.

The Paquettes' other arguments are only marginally relevant to their appeal of the trial court's decree, and we find no need to discuss them. The decision of the trial court is

*Affirmed.*

KING, C.J., and BATCHELDER, J., did not sit; the others concurred.