Merrimack
No. 85-056

## GOODWIN RAILROAD, INC.

v.

## THE STATE OF NEW HAMPSHIRE
### AND
## THE NEW HAMPSHIRE TRANSPORTATION AUTHORITY

October 3, 1986

*Devine, Millimet, Stahl & Branch P.A.*, of Manchester (*John T. Broderick, Jr., & a.* on the brief, and *Mr. Broderick* orally), for the plaintiff.

*Stephen E. Merrill*, attorney general (*Peter S. Scott*, assistant attorney general, and *Nicholas Cort*, attorney, on the brief, and *Mr. Scott* orally), for the State.

BROCK, J. The plaintiff, Goodwin Railroad, Inc. (Goodwin), appeals a decision of the Trial Court (*Nadeau*, J.) awarding it $20,386 for non-reimbursed expenses under its agreements with the State of New Hampshire to operate and to rehabilitate the Concord to Lincoln rail line. The State cross-appeals. For the reasons that follow, we affirm in part, modify in part, and remand.

This dispute centers around the operation and rehabilitation of the Concord to Lincoln rail line during the late 1970's and early 1980's. The issues concern separate and distinct contracts, one to operate, and one or more to rehabilitate, the rail line. For clarity and ease of discussion, we will first analyze the issues involved in the operating agreement. We will then turn to the rehabilitation agreement issues.

## I. *The Operating Agreement—Facts*

In early 1977, the New Hampshire Public Utilities Commission (PUC) entered into an agreement with Goodwin for the operation of the Concord to Lincoln rail line. Under the terms of the operating agreement, Goodwin agreed to provide rail freight services, and the PUC agreed to subsidize the operation. Goodwin was to be subsidized based on the "differences between revenue earnings of the line . . . and the necessary costs of providing services," plus an annual management fee.

Goodwin was required to submit monthly and annual reports to the State, listing its revenues and its costs. The State in turn was to calculate the subsidy payable to Goodwin and make payment on a monthly basis.

Goodwin operated the rail line from February 1977 through December 1980. In 1980, the State began withholding payment of the bills which Goodwin submitted to the State in accordance with the subsidy provision of the operating agreement. Goodwin ceased operating the line in December 1980 and subsequently brought suit to recover monies allegedly due under the operating agreement. The State counterclaimed, seeking to recover a portion of the subsidy payments it had made under the operating agreement on the ground that Goodwin's expenses were unauthorized, excessive, or unreasonable. It further sought reimbursement for profits paid to Goodwin under the rehabilitation contract.

## II. *The Rehabilitation Contract—Facts*

In May 1977, the PUC approached Goodwin about performing rehabilitation work on the Concord to Lincoln rail line. The parties agreed that the rehabilitation work would be performed on a "unit price basis," including a profit component. No written contract was executed.

Goodwin commenced the rehabilitation work in June 1977 and periodically submitted "unit price" requisitions to the State for work performed. Effective August 1, regulatory authority for the operation and rehabilitation of New Hampshire's rail lines was transferred, by statute, from the PUC to the New Hampshire Transportation Authority (NHTA). Laws 1977, 598:2. As of that date, Goodwin had not received any compensation on requisitions previously submitted for completed rehabilitation work. On August 10, Charles Chandler, the acting executive director of the NHTA, contacted Herbert Goodwin, the president of Goodwin, and ordered Goodwin to stop work pending execution of a written contract. Chandler apparently believed that the State would not qualify for federal reimbursement for the rehabilitation work absent a written contract.

Upon learning of the order to stop work, then-Governor Meldrim Thomson, Jr., unequivocally told Chandler that he wanted the rehabilitation work to continue despite Chandler's warning that the State might not receive federal reimbursement under such circumstances. Goodwin continued its rehabilitation work.

The NHTA continued to maintain that a written contract should be executed. The initial draft contract, proposed by Alexander Kalinsky, then-chairman of the PUC, was rejected by the NHTA because it provided that the rehabilitation work would be performed on a profit basis. The NHTA apparently now believed that a "no profit" contract was needed in order for the State to receive federal reimbursement. On September 27, 1977, the NHTA and Goodwin entered into a written contract under which Goodwin would perform the rehabilitation work at no profit. Goodwin continued working, and the State paid substantially all its billings, including a component for profit. Thereafter, however, the federal government refused to reimburse the State.

After Goodwin initiated suit to recover the money alleged to be due under the operating agreement, the State filed a $1,100,000 counterclaim, seeking to recover all the profit which Goodwin had been paid for rehabilitating the rail line. Following a lengthy trial the court entered judgment for Goodwin. The court found that Goodwin had submitted a total of $241,117 worth of billings which

the State had not paid. From this figure the court deducted $232,731, representing a portion of the profit paid under the rehabilitation contract, a portion of the locomotive rental billings, and certain items of income that Goodwin had failed to report. The total due Goodwin was thus $8,386.

Goodwin thereafter filed a motion to set aside/modify/clarify the court's decision and order. As a result of this motion, the court modified its decision to correct a calculation error involving the locomotive rental. Goodwin's award was increased to $20,386. Unsatisfied with this decision, Goodwin filed the present appeal and the State filed the present cross-appeal.

### III. *The Operating Agreement—Issues*

#### A. *Locomotive Rental*

Under terms of the operating agreement, Goodwin agreed to supply a locomotive to provide service on the rail line. For approximately the first year of operation, Goodwin leased a locomotive from Weaver Brothers and charged the State $2000 per month for the rental expense. In early 1978, Goodwin purchased the locomotive from Weaver Brothers. Goodwin continued to charge the State $2000 per month for the locomotive rental until the NHTA informed Goodwin that it could not charge the State for the expense of renting the locomotive since Goodwin owned the locomotive. On April 1, 1978, Goodwin sold the locomotive to Herbert Goodwin, the president of Goodwin, for $20,000. Goodwin then leased the locomotive from Mr. Goodwin and charged the State for the rental expense of $2000 per month. From February 1977 through July 1979, the State reviewed, approved, and paid invoices submitted by Goodwin which included the charge for locomotive rental.

At trial, Goodwin argued that it was entitled to recover its expense incurred in renting the locomotive from Mr. Goodwin from July 1979 until December 1980. The State argued that Goodwin's actions were not efficient and economical, as the operating agreement required, and that therefore the State was entitled to recover amounts wrongfully overcharged by Goodwin. The trial court held that although Goodwin's sale of the locomotive to Mr. Goodwin in April 1978 unreasonably increased the State's expenses, the State was *estopped* from recouping payments actually made, and had waived its right to recover these expenses, because the State paid the locomotive charges on a regular basis. The court also held that Goodwin was not entitled to reimbursement for locomotive rental expenses incurred after July 1979.

On appeal, Goodwin argues that the trial court erred in denying it recovery for the cost of supplying the locomotive from July 1979 until December 1980. The State, on the other hand, argues that the court misapplied the doctrine of estoppel in ruling that "the State is estopped from recouping payment actually made for rental of the locomotive."

We turn first to the State's argument. In a balancing of the equities, the court determined that although Goodwin unreasonably increased expenses, contrary to its agreement to run the railroad economically, the State was unable to recoup payments actually made on the theory of estoppel or waiver. The trial court noted that "[f]rom the evidence introduced and the inferences to be reasonably drawn therefrom, the conclusion is inescapable that the operating agreement was loosely drawn, poorly administered and given less than adequate attention by both parties." Despite provisions in the agreement for readjustment, arbitration, or cancellation, the State approved payment requests for the locomotive rental on a regular basis. As a result, the trial court found that "[h]aving failed to exercise its right to re-examine expenses, to submit disputes to arbitration, or to cancel the contract, the State is estopped from recouping payment actually made for rental of the locomotive. It has waived its right in that regard."

"Estoppel rests largely on the facts and circumstances of the particular case." *Monadnock School District v. Fitzwilliam* , 105 N.H. 487, 489, 203 A.2d 46, 48 (1964). The existence of estoppel is a finding of fact resolved by the trier of fact, which will be upheld if supported by the evidence. *Olszak v. Peerless Ins. Co.*, 119 N.H. 686, 690, 406 A.2d 711, 714 (1979). Estoppel precludes one party from taking a position contrary to one previously asserted when to do so would be unfair. *Appeal of Cloutier Lumber Co.*, 121 N.H. 420, 422, 431 A.2d 112, 113 (1981). "It arises when one party has knowingly made representations upon which the other reasonably has relied to his detriment." *Id. See also Olszak supra; Town of Nottingham v. Lee Homes, Inc.*, 118 N.H. 438, 442, 388 A.2d 940, 942 (1978).

Each time the State approved and paid on Goodwin's invoices, it led Goodwin to believe that the amount charged for the locomotive rental was reasonable and would be paid. In fact, at one point after Herbert Goodwin bought the locomotive, the NHTA determined that the amount charged by Goodwin was reasonable. Because the State did not inform Goodwin that the amount charged for the locomotive rental was inappropriate, Goodwin continued to

lease the locomotive from Mr. Goodwin and, in turn, to charge the expense to the State. For the above reasons, we find no error in the trial court's decision to disallow recoupment of the monies the State paid to Goodwin for the locomotive rental.

We next turn to the issue of whether the trial court erred in denying Goodwin's recovery for the cost of supplying the locomotive after the State refused to pay the invoices. Goodwin contends that the operating agreement did not require it to purchase or own a locomotive. Goodwin asserts that in effect the trial court rewrote the contract, contrary to principles of contract law, to require that Goodwin own a locomotive. Goodwin further argues that the court's ruling was inconsistent with the State's conduct.

We find Goodwin's arguments on this issue unpersuasive. First, the trial court's decision did not directly or indirectly require that Goodwin own a locomotive. The court did not question the rental of the locomotive from Weaver Brothers. Rather, the court focused its attention on Goodwin's purposeful sale of the locomotive to the company's president within months after acquiring it, apparently with the sole intention of continuing to charge the locomotive's rental as an expense of the project. Once Goodwin had purchased the locomotive and had been told that it could not charge rental as an expense if it owned the locomotive, it would have been more economical to charge the State for its depreciation and investment return, rather than to turn around and sell the locomotive to the company president just so that it could be leased again and the rent charged as an expense.

Further, we disagree with Goodwin's assertion that the court's ruling was inconsistent with the State's conduct. The State did not question the reasonableness of the locomotive rental expense until July 1979 and was thus estopped from recouping the payments it made. After the State refused to pay on the invoices and questioned the reasonableness of the expense, the estoppel argument was no longer plausible and the court was free to decide whether the expense was indeed reasonable. In sum, we find no error in the trial court's modified ruling on the issue of expenses for locomotive rental.

The State urges that should we affirm the trial court's decision on the estoppel issue, the ruling should not bar recovery of the expenses billed by Goodwin in excess of its actual rental costs. The State asserts that for approximately one year Goodwin rented the locomotive from Weaver Brothers for $1,750 per month yet charged the State $2000 per month. While there is some evidence to support the State's assertion, the testimony in this regard is unclear; hence, we

defer to the trial judge, who was in the best position to measure persuasiveness of evidence and credibility of witnesses. *Kierstead v. Betley Chevrolet-Buick, Inc.*, 118 N.H. 493, 497, 389 A.2d 429, 432 (1978).

## B. *Truck Rental*

Goodwin used three specially-equipped trucks in connection with its operation of the rail line. Goodwin rented these trucks from Mr. Goodwin and charged the rental expense to the State. At trial, the State challenged these rental expenses. The trial court found that Goodwin charged a reasonable rental fee and that it was reasonable for Goodwin to pay a fair rental for their use.

On appeal, the State argues that the trial court's assertion that Goodwin "never owned trucks" was plain error and that, consequently, the court's finding that it was reasonable to pay fair rental for their use was also erroneous. The State asserts, therefore, that it should be able to recover the amount Goodwin billed the State for truck rental.

Once again we are confronted with a situation where there is some evidence to support the State's assertion that Goodwin did, at one time, own the trucks. However, again we choose to defer to the trial judge, who was in the best position to determine this issue. *Kierstead, supra* at 493, 389 A.2d at 432. Thus, we find no error.

## C. *Unreported Income*

Goodwin did not either charge the State the expense of, or include the income from, construction work that Goodwin performed for certain private contractors. As part of its counterclaim, the State asserted that the revenue and expenses from this so-called off-line work were attributable to the operation of the rail line and therefore should be considered in calculating the subsidy Goodwin was to receive under the operating agreement. Goodwin contended that the construction work was unrelated to the operation of the Concord to Lincoln rail line and should not be considered in calculating the subsidy. The trial court found that all the income which Goodwin considered off-line was income required to be reported under the operating agreement.

■■ On appeal, Goodwin challenges this finding, claiming that work performed for others which was not required by the operating agreement should not be considered revenue attributable to the rail line. We note at the outset that, as a general rule, the proper interpretation of a contract is ultimately a question of law for this court, and we will determine the meaning of the contract based on the meaning that would be attached to it by reasonable persons. *Baker*

*v. McCarthy*, 122 N.H. 171, 174–75, 443 A.2d 138, 140 (1982). In interpreting the contract, we apply the common meaning of the words and phrases used by the parties. *Murphy v. Doll-Mar, Inc.*, 120 N.H. 610, 611–12, 419 A.2d 1106, 1108 (1980).

Section 801.A of the operating agreement provides that the revenue earnings of the rail line "shall include, *but not be limited to,* those revenues received by Goodwin resulting from the use of the line for the provision of originating and terminating traffic, overhead traffic, *and other related activities . . . .*" After examining the contract as a whole, we are unable to find error in the trial court's finding that the income considered by Goodwin to be off-line is revenue required to be reported under the contract. A reasonable reading of Section 801.A indicates that all the disputed income falls within the contractual definition of "revenue earnings." We thus affirm the trial court's ruling on the issue of unreported income.

### D. *Testimony of Federal Auditor*

During the course of the trial, Kenneth Brown, an auditor for the Office of the Inspector General, United States Department of Transportation, was permitted to testify about the off-line work. Goodwin objected to the admission of this testimony because it was not based on Brown's personal knowledge, but rather on a fellow auditor's work, and because Brown could not therefore be effectively cross-examined.

On appeal, Goodwin argues that because the auditor's testimony was not based on personal knowledge, but rather on records which constituted inadmissible hearsay, the trial court erred in admitting the testimony. The trial court's decision to admit testimony will not ordinarily be disturbed on appeal unless the trial court's determination is found to be clearly erroneous. *See Town of Weare v. Paquette*, 121 N.H. 653, 659, 434 A.2d 591, 596 (1981).

We cannot say that under the facts of this case the trial court was clearly erroneous in allowing Mr. Brown to testify about the off-line work. *See Cities Service Oil Company v. Coleman Oil Company, Inc.*, 470 F.2d 925, 932 (1st Cir.), *cert. denied*, 411 U.S. 967 (1972); *see also* N.H. R. Ev. 602 (although not in effect at the time of trial, this rule lends support to the trial court's determination). Mr. Brown testified that he supervised and verified those portions of the audit that were conducted by his fellow auditor, Mr. Mackey. Further, he testified that he knew "as a personal matter, the accuracy of the total[s]" on Mr. Mackey's portion of the audit. Thus, the trial court was correct in ruling that Mr. Brown was competent to testify as to those matters of which he had personal knowledge.

IV. *The Rehabilitation Contract—Issues*

██ ██ On appeal, Goodwin asserts that the trial court erred in determining that Goodwin was not entitled to retain the profit received for work done after the stop-work order. To a limited extent, we agree, and modify the trial court's decision accordingly.

> "A contract may be established by spoken or written words or by acts or conduct and where there is a disputed question of fact as to the existence and terms of a contract it is to be determined by the trier of facts, provided there is any evidence from which it could be found there was a contract between the parties."

*Harrison v. Watson,* 116 N.H. 510, 511, 363 A.2d 204, 205 (1976); *see Maloney v. Company,* 98 N.H. 78, 82, 95 A.2d 129, 132 (1953). "An implied in fact contract is a true contract that is not expressed in words; the terms of the parties' agreement must be inferred from their conduct." *Morgenroth & Assoc's, Inc. v. Town of Tilton,* 121 N.H. 511, 514, 431 A.2d 770, 772 (1981) (citing 1 A. CORBIN, CONTRACTS § 18 (1963); RESTATEMENT OF CONTRACTS § 5, comment *a* (1932); 1 S. WILLISTON, A TREATISE ON THE LAW OF CONTRACTS § 3 (1957)).

There can be no question that the State, through the authority of the Governor, entered into an oral contract with Goodwin for the rehabilitation of the rail line. The PUC approached Goodwin, who was already under contract with the State for the operation of the rail line, about performing rehabilitation work on the line. The parties discussed the terms of their agreement, and the Governor requested that Goodwin start the rehabilitation work immediately.

██ ██ In interpreting a contract, we focus on the intent of the contracting parties at the time of the agreement. *Trombly v. Blue Cross/Blue Shield,* 120 N.H. 764, 770, 423 A.2d 980, 984 (1980). Interpretation of a contract is, by necessity, fact-oriented; thus we consider the situation of the parties at the time of their agreement. *Commercial Union Assurance Co. v. Brown Co.,* 120 N.H. 620, 623, 419 A.2d 1111, 1113 (1980). The parties reached an agreement whereby Goodwin would rehabilitate the rail line and the State would reimburse Goodwin for its costs, plus a profit. Goodwin began the rehabilitation work immediately, as requested. Based on this agreement, Goodwin reasonably expected to receive compensation, including a profit component. We thus agree with the trial court that Goodwin is entitled to retain the profit it received under the terms of the oral contract.

We find error, however, in the trial court's determination that the stop-work order was notice to Goodwin that any work performed after that date was at its peril. At the time of the issuance of the stop-work order, Goodwin was told that the State might not be entitled to receive federal reimbursement without a written contract. Nothing was said to indicate that there was any problem with the profit component of their agreement. Further, following the issuance of the stop-work order, the Governor unequivocally informed Chandler that he did not have authority to issue the order, and advised Goodwin to continue with the work. Goodwin did just that. Not until sometime later was Goodwin informed that there might be a problem with the profit component of the contract.

■■ On September 27, 1977, the parties entered into a written contract covering the rehabilitation work. Upon the insistence of the NHTA, the contract explicitly provided that Goodwin was not to receive a profit. Goodwin claims that this contract was signed under duress, and that therefore it should not be given effect. We disagree. To establish duress, a party must show that it involuntarily accepted the other party's terms, that the coercive circumstances were the result of the other party's acts, that the other party exerted pressure wrongfully, and that under the circumstances the party had no alternative but to accept the terms set out by the other party. *King Enterprises v. Manchester Water Works*, 122 N.H. 1011, 1014, 453 A.2d 1276, 1277 (1982). We do not feel that the actions of the parties in this case show such a level of coercive activity as to require a finding of duress.

We find that the provision in the written contract providing that Goodwin was not entitled to a profit should be given effect. Thus, Goodwin is not entitled to a profit on work performed after the execution of the September 27 contract.

■■ The State contends that the September 27 contract was fully integrated and that therefore any prior agreements or understandings of the parties were superseded by the written document. The State argues that the admission of evidence of such prior agreements violated the parol evidence rule. Exceptions to the parol evidence rule, however, allow the admission of parol evidence to prove misrepresentation, *Colby v. Granite State Realty, Inc.,* 116 N.H. 690, 691–92, 366 A.2d 482, 484 (1976); fraud, *Baranowski v. Linatsis*, 95 N.H. 55, 57, 57 A.2d 155, 156–57 (1948); and consideration, *Day v. Washburn*, 76 N.H. 203, 205, 81 A. 474, 475 (1911). *See generally* 3 CORBIN ON CONTRACTS § 580, at 431–39 (1960). Because Goodwin claimed that the September 27 contract was invalid due to

misrepresentation, duress, and lack of mutual consideration, we find that the trial court properly admitted evidence as to the parties' prior understandings and negotiations.

In summary, we affirm that the trial court's decision with respect to the issues raised concerning the operating agreement and modify the court's decision as it concerns the rehabilitation contract. Goodwin is entitled to retain the profit it received up until September 27 when the written contract was executed. We therefore remand to the trial court to recalculate, consistent with this opinion, the credit due to the State on the rehabilitation contract and to readjust the total due Goodwin accordingly. Because we reach this result, we need not separately address the remaining issues raised by the parties.

*Affirmed in part; modified in part; and remanded.*

SOUTER, J., did not sit; the others concurred.