POST MACHINERY COMPANY, INC. (MA); Post Machinery Company, Inc. (NH); Paxall Group, Inc., a/k/a Paxall, Inc.

v.

George TANGES; Harry Reizenstein.

George TANGES; Harry Reizenstein

v.

POST MACHINERY COMPANY, INC. (MA); Post Machinery Company, Inc. (NH); Paxall Group, Inc., a/k/a Paxall, Inc.; John Does I–X.

Civ. Nos. 86–33–D, 86–109–D.

United States District Court,
D. New Hampshire.

Feb. 1, 1989.

Debra L. Weiss, Manchester, N.H., Robert B. Jones, Chicago, Ill., Raymond T. Munsell, New York City, for Post Machinery Co., Inc. (MA), et al.

Wilbur A. Glahn III, Manchester, N.H., and Philip Furgang, New York City, for George Tanges and Harry Reizenstein.

## ORDER

DEVINE, Chief Judge.

George Tanges and Harry Reizenstein are inventors of a patented device used in the manufacture of cardboard boxes. Tanges and Reizenstein exclusively licensed Post Machinery Company's ("Post") predecessor in interest to make, use, and sell said device. In this consolidated action,[1] Tanges and Reizenstein allege that Post breached the licensing agreement and infringed their patent when Post stopped selling their device and began selling a different device, on which Post obtained a patent. Defendants seek a declaratory judgment that the licensing agreement has not been breached and that plaintiffs' patent is invalid. The matter is currently before the Court on the parties' cross-motions for summary judgment.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. The moving party has the burden to establish the lack of a genuine, material factual issue. *Finn v. Consolidated Rail Corp.*, 782 F.2d 13, 15 (1st Cir.1986). The Court must view the record in the light most favorable to the nonmovant, according it all beneficial inferences discernable from the evidence. *Oliver v. Digital Equip. Corp.*, 846 F.2d 103, 105 (1st Cir.1988).

### Factual Background

Post makes equipment that folds cardboard into boxes as it moves down an assembly line. Although folding the forward and side edges of the boxes is a straightforward procedure, folding the trailing edge is more difficult. In the early 1970's, plaintiffs invented a device to fold the trailing edge of the boxes ("Tanges device").[2] On August 26, 1975, plaintiffs were issued United States Patent No. 3,901,134 for "Self–Synchronized Trailing Edge Folder Assembly Accessory for Folder–Gluer" ('134 patent) on the Tanges device.

In August 1977 plaintiffs entered into a licensing agreement with Post[3] under which Post agreed to make, use, and sell the Tanges device and to pay plaintiffs royalties on sales of the device. There-

---

**1.** Tanges and Reizenstein originally filed their action in the United States District Court for the Southern District of New York in 1985. Post subsequently filed its declaratory judgment action in this court (Civil No. 86–33–D). Tanges and Reizenstein consented to the transfer of their New York action to this district, where it was docketed as Civil No. 86–109–D. The actions were then consolidated by order of the Clerk of Court dated April 16, 1986. Because the instant motions pertain to counts of the C. 86–109 complaint, Tanges and Reizenstein will hereinafter be referred to as "plaintiffs", and Post, et al, will hereinafter be referred to as "defendants".

**2.** The Tanges device is described in the licensing agreement as "an accessory for a straight-line folder-gluer which will fold the trailing edge of a box blank forward as the blank moves continuously therethrough, which accessory includes (a) an endless loop which is intermittently operative and which carries a pivotal folding finger which is biased to a rest position, (b) cam means for pivoting the finger forward as it moves adjacent and below a moving box blank and (c) sensing means initiating motion of the loop when a box blank is sensed at a predetermined location...." The device includes electronic techniques for "automatic self-synchronized timing".

**3.** Plaintiffs actually negotiated the agreement with Post's corporate predecessor, a wholly owned subdivision of Paxall Corporation. In 1980 Paxall dissolved the predecessor's corporate structure and operated Post as an unincorporated and wholly independent subdivision. In 1984 Paxall sold this business to a new corporation, formed in New Hampshire, known as Post Machinery Company, Inc. All three corporations are defendants in this action.

after, plaintiffs delivered a prototype of the device to Post. Post redesigned some of the equipment and began selling the Tanges device in 1978. Between 1978 and 1982, Post paid plaintiffs total royalties in excess of $110,000 on sales of the Tanges device pursuant to the licensing agreement.

In 1982 Post stopped making the Tanges device and substituted a folding device invented by Charles Eldridge, a Post employee (hereinafter "Eldridge device"). Post obtained a patent on the Eldridge device in 1984, Patent No. 4,432,745 ('745 patent).[4] When Post began selling the Eldridge device in 1982, it stopped selling the Tanges device and stopped paying royalties to plaintiffs.

*Discussion*

Plaintiffs' action is pled in seven counts. Counts I through III are for breach of contract. Count IV, in the alternative, seeks reformation of the contract. Counts V and VI charge defendants with patent infringement, and Count VII alleges misappropriation of plaintiffs' trade secrets. The parties' motions for summary judgment place at issue all counts except Count VII. In dispute is the interpretation of the terms of the licensing agreement.

In Count I, plaintiffs claim that Post's substitution of the Eldridge device constitutes a breach of Post's contractual duty to make, use, and sell the Tanges device, entitling them to royalty payments on Post's sales of the Eldridge device.

 As an exclusive licensee of the Tanges device, Post was obliged to use due diligence in manufacturing and selling said device. This obligation is generally implied in contracts in which the consideration for a grant of property lies in payment of royalties. *See Mechanical Ice Tray v. General Motors Corp.*, 144 F.2d 720, 725 (2d Cir.1944) (and citations therein), *cert.*

*denied,* 324 U.S. 844, 65 S.Ct. 679, 89 L.Ed. 1406 (1945); *see also Vacuum Concrete Corp. v. American Machine & Fdry. Co.,* 321 F.Supp. 771, 773 (S.D.N.Y.1971) ("The reasoning of these decisions is that it would be unfair to place the productiveness of the licensed property solely within the control of the licensee, thereby putting the licensor at his mercy, without imposing an obligation to exploit upon the licensee."). However, if a new, different invention renders the licensed device unmarketable, an exclusive licensee may stop selling the licensed good without breaching its duty of due diligence. *Eclipse Bicycle Co. v. Farrow,* 199 U.S. 581, 589, 26 S.Ct. 150, 153, 50 L.Ed. 317 (1905).

In *Eclipse Bicycle,* the licensor, Farrow, had invented an improvement to bicycle coaster brakes. Eclipse Bicycle obtained an exclusive license to sell the Farrow device in exchange for payment of royalties. Eclipse employees subsequently invented and sold a different braking device (the "Morrow device"), which embodied the Farrow device and was not superior to it. In addition, Eclipse invented and sold a new braking device, called the E 10, which operated on a different principle and was superior to the original device.

The court held that Eclipse was obligated to pay royalties on the sales of the Morrow device, but not on sales of E 10. The court reasoned that sale of the new, improved device was not a breach of Eclipse's covenant to use due diligence because "due business diligence would not require [Eclipse] to enter into a hopeless contest." *Id.* at 589, 26 S.Ct. at 153. "If ... E 10 did not embody Farrow's invention, and if the company reasonably and honestly thought it a better thing, it had a right to do what it did." *Id.* at 592, 26 S.Ct. at 154.

Subsequent cases have stated that "an implied obligation to exploit assigned pat-

---

**4.** The patent abstract describes the Eldridge device as an "apparatus for folding the trailing edge of paperboard blanks conveyed along a straight-line path includ[ing] a rotatable shaft disposed below and transverse to the conveyor and having arms with heads at their ends which extend upward through openings between conveyor belts. The shaft is rotated to cause the head to contact the [trailing edge of box blanks]. To rotate the shaft intermittently it is momentarily connected to a continuously rotating drive by a clutch-brake which permits substantially instantaneous engagement and disengagement." A photodetector determines the position of the blank and responds by actuating the clutch brake at the proper time.

ents is not binding if its observance would prevent the assignee from meeting market competition with a reasonable chance of success." *Eastern Elec., Inc. v. Seeburg Corp.*, 310 F.Supp. 1126, 1144 (S.D.N.Y. 1969) (citing *Mechanical Ice Tray, supra,* 144 F.2d at 725). "[T]o escape liability for royalties under a contract requiring promotion of an assigned or licensed device the outside device must be both better than and different from the assigned or licensed device." *Carbo–Frost, Inc. v. Pure Carbonic,* 103 F.2d 210, 222 (8th Cir.1939). Therefore, if the Eldridge device is superior to the Tanges device, and does not embody it, and if exploitation of the Tanges device would have prevented Post from meeting market competition,[5] then Post did not breach its duty of due diligence when it stopped selling the Tanges device. *Id.*

■ The resolution of these questions involves disputed issues of material fact. The inventors of the two folding devices have submitted conflicting affidavits which identify differences and similarities between the devices. In addition, there is a dispute regarding the marketability of the Tanges device. Mr. Eldridge avers that the Tanges device incurred significant maintenance problems and customer complaints and was much slower than the Tanges device. Plaintiffs challenge these conclusions, noting that there were similar complaints about the Eldridge device. In sum, whether the Eldridge device "embodies" the Tanges device and is superior to it are questions of fact which must be decided by the jury. *See Carbo–Frost, supra,* 103 F.2d at 220 (finder of fact must compare and contrast the nature of the different devices); *cf. SRI Int'l v. Matsushita Elec. Corp. of America,* 775 F.2d 1107,

1117 (Fed.Cir.1985) (in infringement action, determination of whether devices operate in substantially different ways and accomplish similar functions is a question of fact and is inappropriately decided on summary judgment). Accordingly, plaintiffs' motion for summary judgment regarding Count I of the complaint must be denied.

The parties have filed cross-motions for summary judgment regarding Count II of the complaint. The parties' dispute concerns the interpretation of paragraph 5(b) of the licensing agreement, which states: "Licensors agree that rights to improvements to said Development shall be included as part of this agreement, and Post agrees that the royalty payments shall be extended to the end of the life of all patents obtained on said improvements."

Plaintiffs assert that Post owes royalties under the express terms of paragraph 5(b) because the Eldridge device is an "improvement" over the Tanges device. Defendants argue that the contract construed as a whole evidences their intent to pay royalties only on improvements invented by plaintiffs alone or on improvements jointly invented by plaintiffs and Post employees, but not on improvements invented solely by Post employees. The parties agree that a Post employee invented the Eldridge device.

■ The meaning of a contract is ultimately a matter of law for the Court to decide. *Goodwin R.R., Inc. v. State,* 128 N.H. 595, 602, 517 A.2d 823, 829 (1986). In interpreting contracts, the fundamental inquiry is to determine the intent of the parties at the time of the agreement. *Trombly v. Blue Cross/Blue Shield of*

---

5. Contrary to plaintiff's argument, market competition is not limited to the competition which existed prior to the introduction of the Eldridge device, but includes a consideration of whether the Tanges device was competitive with the Eldridge device. The *Mechanical Ice Tray* decision expressly permitted an exclusive licensee to purchase the rights to sell a superior device without breaching its obligation to use due diligence. The court stated:

[I]f the competition comes from a better article than the one licensed, [the licensee] is under no obligation to try with no hope of success to meet it with the licensed device. Faced with such a business situation, he may, if he can, obtain and exercise the right to make or use the competing article without violating any obligation to exploit under his exclusive license. *Id.*

The fact that Post invented the competing device, as opposed to purchasing it, does not deprive it of the due diligence exception. If a superior device renders the licensed device unmarketable, the licensee has no obligation to pursue sales of the original device.

*NH–VT,* 120 N.H. 764, 770, 423 A.2d 980, 984 (1980). The language of any written agreement is not completely dispositive of the parties' intent. *MacLeod v. Chalet Susse Int'l,* 119 N.H. 238, 243, 401 A.2d 205, 208 (1979). Instead, the Court should consider the parties' situation at the time of their agreement and the object that was intended thereby, together with all provisions of their agreement taken as a whole. *R. Zoppo v. City of Dover,* 124 N.H. 666, 671, 475 A.2d 12, 15 (1984).

■ Construing the contract as a whole and taking the objectives of the agreement into account, the Court finds the contract cannot reasonably be construed as intending to exclude from its provisions improvements to the Tanges device which were invented solely by Post.[6] Plainly, the parties understood that Post would make improvements to the Tanges device. Plaintiffs provided Post with a "prototype", thus anticipating that alterations would be made to the device. Additionally, the agreement explicitly stated that Post was licensed to sell machines "embodying the development",[7] and Post was thus obligated to pay royalties on those sales.

To allow the defendants to obtain rights to the prototype and then incur no obligation to pay royalties if they somehow improved the device would be a manifestly unreasonable interpretation of the contract.

In fact, such an interpretation would conflict with Post's actual performance under the contract. It is undisputed that Post redesigned the mechanical equipment on the Tanges device before it sold the device, yet it paid royalties on sales of these improved devices. Thus Post paid royalties for four years under an obligation which it now argues it does not have.

The paragraphs in the agreement upon which Post relies to support its position are of no avail and simply reflect Post's intention to protect its interest in the licensing agreement by guaranteeing that the agreement also cover any improved versions of the Tanges device invented by plaintiffs.[8] They do not, however, limit the definition of the term "improvement" to such devices.

Accordingly, because the parties' agreement does not express an intention to exclude improvements invented solely by Post, defendants' cross-motion for summary judgment as to Count II must be denied.[9]

■ Plaintiffs argue that summary judgment should be granted in their favor on Count II because the Eldridge device constitutes an improvement over the Tanges device, thereby obligating Post to pay royalties on its sales of the Tanges device. Plaintiffs argue that the term "improvement" should be broadly construed to mean

---

**6.** Post has submitted the affidavit of Mr. Malcolm A. Douglas, who apparently negotiated the agreement on Post's behalf, which states that he did not intend to include improvements invented by Post in the agreement. However, "[t]he intent of the parties in entering an agreement is to be judged by objective or external criteria rather than by unmanifested states of mind of the parties." *Logic Assoc., Inc. v. Time Share Corp.,* 124 N.H. 565, 572, 474 A.2d 1006, 1010 (1984) (quoting *Tentindo v. Locke Lake Colony Assoc.,* 120 N.H. 593, 599, 419 A.2d 1097, 1101 (1980)). Because the intent of the parties in this case is manifested by objective criteria, the Court need not consider Mr. Douglas's affidavit. Accordingly, plaintiffs' motion to strike the Douglas affidavit on other grounds is rendered moot.

**7.** Paragraph 2 states that "LICENSORS hereby grant and convey unto POST an exclusive license to make, have made, use and *sell* machines embodying said Development...." The "whereas" clause specifically states that Post de-

sired to sell machines "embodying the development".

**8.** For example, Post argues that because paragraph 5(b) states that *licensors* agree that rights to improvements are included in the agreement, improvements could only mean improvements to which plaintiffs have some claim. In addition, Post notes that the "whereas" clause states that Post desires to sell machines "embodying said Development and any future improvements therein that may hereafter be made or obtained by *LICENSORS.*"

**9.** In Count IV of the complaint, plaintiffs seek reformation of the contract in the event that the Court finds that paragraph 5(b) by its terms excludes improvements invented by Post. Because the Court has found that paragraph 5(b) does not exclude improvements by Post, *reformation is no longer at issue, and defendants'* motion for summary judgment on Count IV is rendered moot.

that Post's sale of any superior folding device is subject to royalty payments.

The Court finds that the contract cannot reasonably be construed that broadly. It is clear from the agreement that royalties are due on devices which "embody" the Tanges device, but it would be unreasonable to construe the contract to mean, for example, that an entirely different device, invented exclusively by Post, was included in the licensing agreement because it was somehow superior to the plaintiff's device. *See Mercoid Corp. v. MidContinent Co.*, 320 U.S. 661, 667, 64 S.Ct. 268, 272, 88 L.Ed. 376 (1944) (licensor of patent rights may not obtain by contract what letters patent alone may grant). Thus, the Court finds that Post may only be said to have breached the agreement if the folding device it sold after 1982 was an improvement which embodied the Tanges device. For the same reasons set forth above, the resolution of this question involves disputed issues of material fact. Accordingly, plaintiffs' motion for summary judgment on Count II must be denied.

■ The parties have also filed cross-motions for summary judgment regarding Count III. Plaintiffs argue that Post breached the agreement when it failed to transfer the patent for the Eldridge device to plaintiffs upon the sale and assignment of assets from the Paxall Group, an interim owner, to Post. Plaintiff relies on paragraph 8(c) of the agreement to support its argument. That paragraph states:

> If POST becomes insolvent or bankrupt and/or if the business of POST shall be placed in the hands of Receiver, Assignee, or Trustee, whether by the voluntary act of POST or otherwise, then this license shall immediately terminate, and all improvements, patents, and patent ap-

plications related to subject Development shall be assigned, at no cost, to the LICENSORS.

Plaintiffs argue that because Post was an "assignee" of the predecessor corporation, this paragraph requires rights in the Eldridge device, as an "improvement", to be assigned to them. The Court does not agree.

Paragraph 8(c) may only reasonably be construed as providing that assets should revert to plaintiffs in the event that Post entered into some sort of financial distress which required the corporation to be placed in receivership. In the instant case, Post was not placed in receivership; the assignment was due to a change in Post's corporate structure. Therefore, paragraph 8(c) is not applicable. Because paragraph 11 clearly states that the licensing agreement is fully assignable,[10] the agreement remained in effect when the assets were transferred from Paxall to Post. Accordingly, defendants' motion for summary judgment as to Count III is herewith granted.[11]

■ Defendants also move for partial summary judgment regarding Count V of the complaint. In Count V, plaintiffs charge Post with infringing the Tanges device patent by selling both the Eldridge and Tanges devices.[12] Post argues that its sales of the Tanges device do not constitute infringement of the '134 patent as a matter of law because Post paid royalties pursuant to the licensing agreement on all of its sales of the device.

Post has submitted an undisputed affidavit which states that, pursuant to its licensing agreement with plaintiffs, Post paid royalties on all of its sales of the Tanges

---

**10.** Paragraph 11 states, in pertinent part: "This License Agreement shall be binding upon and inure to the benefit of the heirs, executors, administrators and assigns of LICENSORS and to the successor and assigns of POST."

**11.** Plaintiffs concede that if summary judgment is granted in Post's favor regarding Count III, then summary judgment must be granted in Post's favor regarding Count VI, in which plaintiffs charge Post with patent infringement based on their alleged rights in the Eldridge device.

Accordingly, Post's motion for summary judgment regarding Count VI is herewith granted.

**12.** The complaint states: "The defendants are manufacturing, selling, and using FOLDING DEVICE (1 and/or 2) embodying the subject matter of the said United States Letters Patent owned by the plaintiffs herein, namely the '134 patent and are thereby infringing said letters patent...."

**62**

device between 1978 and 1982. Accordingly, the Court finds that Post is not liable for patent infringement for sales of the Tanges device on which it paid royalties to plaintiffs, and accordingly grants defendants' motion for partial summary judgment on Count V. *See United States v. Studiengesellschaft Kohle, m.b.H.*, 670 F.2d 1122, 1127 (D.C.Cir.1981) ("A 'license' is an agreement by the patentee, usually for a consideration, not to sue the licensee of the patent for infringement of the patent."). However, the issue of whether Post's sale of the Eldridge device (on which it did not pay royalties) infringed plaintiffs' patent still remains for trial.

Plaintiffs also move for dismissal of certain paragraphs of defendants' counterclaim for declaratory judgment, stating that defendants have not presented any evidence to support the allegations. In the alternative, plaintiffs request dismissal of the counterclaim in full, claiming it is redundant of defendants' affirmative defenses in the infringement action. Plaintiffs cite no legal authority to support these motions, and the Court accordingly declines to consider them. *See* Local Rule 11(c).

In sum, plaintiffs' motion for summary judgment (document no. 71) is herewith denied. Defendants' motion for summary judgment regarding Count II (document no. 65) is denied. Defendants' motions for summary judgment regarding Counts III (document no. 66) and VI (document no. 69) and for partial summary judgment regarding Count V (document no. 68) are herewith granted. Defendants' motion for summary judgment regarding Count IV (document no. 67) and plaintiffs' motion to strike (document no. 75) are moot.

SO ORDERED.