Sharif v. Dartmouth Medical School    CV-93-614-B    03/28/96
                   UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF NEW HAMPSHIRE


Adil M. Y. Sharif

      v.                                      Civil No. 93-614-B

Dartmouth Medical School, et al.


                    **MEMORANDUM AND ORDER**


      Adil Sharif was a second-year student at Dartmouth Medical

School when he was dismissed.  Appearing pro se, Sharif brings

suit against Dartmouth, several members of the faculty and

administration, and a fellow student, alleging federal and state

causes of action arising from the circumstances surrounding his

dismissal.  Both Sharif and the defendants move for summary

judgment.  For the following reasons, I grant summary judgment in

favor of the defendants.


                  **I.  FACTUAL BACKGROUND**

      Sharif began the Dartmouth Medical School four-year program[1]

_____

      [1]  The Dartmouth program is affiliated with Brown University
so that after two years at Dartmouth, the students move to Brown
to complete the four-year program.

in 1989.  By the middle of his first year, Sharif was experiencing academic problems, having earned low pass grades in two courses.  As a result, the Committee on Student Performance[2] ("CSP") placed him on "Academic Notice."[3]  Sharif then failed his neuroanatomy course.  He was allowed to take a reexamination in neuroanatomy,[4] which he passed.  He received another low pass

---

[2]  The CSP is a standing committee consisting of department chairpersons, program directors, and deans and is chaired by the dean of the medical school.  The CSP considers all matters relevant to students' degree requirements and hears cases involving students' conduct and academic standing.  Student Policy Handbook at pp. 15-16.

[3]  Dartmouth's Student Policy Handbook includes a "Policy on Academic Notice," which provides that a student "whose academic performance is not satisfactory" will be placed on Academic Notice "to inform the student of the faculty's concern for their academic progress."  Academic Notice is a status prior to consideration for dismissal but is not a necessary prerequisite for dismissal.  The following academic deficiencies are grounds for Academic Notice:  a course failure, two or more low pass grades or one low pass in a required clerkship, and repeating a year in the program.  Handbook at page 15.

[4]  The Handbook provides for reexamination as follows:  "A student who fails one course during a single academic year shall ordinarily be permitted a re-examination.  Please refer to paragraph #9."  Paragraph 4, Academic Regulations, Handbook at 14.  Paragraph 9 provides:  "Permission for any re-examination must be given by the Office of Academic Affairs, which will determine the date of the re-examination in consultation with the course director.  No more than one re-examination per course will be permitted."  Academic Regulations, Handbook at 15.

grade at the end of the first year, however, and the CSP continued his Academic Notice status into his second year with an additional condition that he receive counseling to help him deal with "interpersonal problems."[5]  Sharif fared no better during his second year, earning low passes in three courses by mid-term and a failure in endocrinology.

## A.    The CSP Dismissal Decision

The CSP met on February 27, 1991, to review Sharif's academic performance in response to his failure in endocrinology. The endocrinology faculty reported that Sharif's performance was deficient in five areas: (1) poor performance in the final examination including "a serious inability to discriminate and organize information and to reason in a problem solving/

---

[5]  The CSP explained its concerns in its letter to Sharif as follows:

> The committee remains very concerned about your behavior, especially your attempts to manipulate faculty members and your interactions with support staff and other students.

> We feel you will be at risk for interpersonal problems when you participate in the patient interactive parts of our curriculum, and the committee requires that you obtain counseling about this.

hypothesis-testing mode"; (2) failure to attend seven of the nine small group conferences that were course requirements; (3) failure to take the quizzes that were provided for self-examination and small group discussion; (4) failure to explain his absence or make up the work missed following the vacation break; (5) failure to change his approach to the course after counselling with two faculty members and the director of second year studies, Dr. Arthur Naitove. The faculty concluded that he lacked a sufficient base of knowledge to pass but also expressed concern "about his commitment to his education as a physician and to the responsibilities that go with that commitment." They confirmed that his performance merited a failing grade and that re-examination would not make up his deficit.

The meeting minutes also report that the CSP discussed "concerns about a "personality/judgement disorder." Although Dr. Naitove expressed concern that Sharif was not being allowed a reexamination based on the endocrinology faculty's conclusion that he should not pass the course, the CSP voted to endorse the decision not to allow reexamination. The CSP also voted to dismiss Sharif from the school due to his academic deficiencies.

After the meeting, Dr. Naitove informed Sharif of the CSP's decision to dismiss him, and he was notified officially in a

4

March 5, 1991 letter from Dr. O'Donnell.  The March 5 letter stated that the CSP voted to separate Sharif from Dartmouth "because of [his] poor academic performance."  It summarized his performance in Year I as low pass grades in gross anatomy, microscopic anatomy, and physiology, and a failure in neuroanatomy; and in Year II, low pass grades in hematology, respiration, and cardiology, and a failure in endocrinology.  The letter also enclosed pages from the Student Policy Handbook related to the hearing process.

B.    **The First CSP Appeal Hearing**

Pursuant to the procedures described in the Handbook, an appeal hearing was scheduled on the CSP's February decision for March 27, 1991.  Prior to the hearing, Dr. O'Donnell received reports of incidents involving Sharif in his psychiatry small group and physical diagnosis classes.  At the hearing, the CSP considered Sharif's academic record, evidence of the class incidents, and testimony from Sharif's brother, a friend, and Sharif.  A faculty advisor also accompanied him at the hearing.

A partial transcript from the CSP's discussion following the March hearing reveals disagreement among the members about the appropriate procedure to follow.  Dr. Naitove stated that he favored allowing Sharif to repeat his second year because he felt

5

that the CSP had allowed much worse students to stay. Dr. Naitove also complained that the CSP was treating Sharif differently because of his behavior pattern. Nevertheless, the CSP voted to uphold its February decision to separate Sharif for academic reasons.

## C.    The Second CSP Appeal Hearing

In an executive session held on April 10, the CSP voted to uphold its previous decision to separate Sharif because of his academic record, but also decided to invite Sharif to attend a second hearing to further address the behavior incidents considered at the March hearing. Dr. O'Donnell sent Sharif notice of the CSP's decision on April 11 stating that the following behavior issues would be addressed at the next hearing:

> your inappropriate interactions with patients in the
> psychiatry small group and the pelvic examination in
> the physical diagnosis course; your interactions with
> your peers; and your inability to change your behavior
> in your own educational process, even when told
> specifically what was expected of you (e.g., in the
> endocrinology course).

The second hearing was held on May 8. Sharif was represented by counsel. The CSP again reviewed the evidence of the cited behavior incidents first raised at the March hearing. Following the hearing, the CSP again voted in favor of dismissal. On May 9, O'Donnell wrote to the dean at Brown University School

6

of Medicine to inform him that Sharif would not go to Brown that year due to academic difficulties. O'Donnell notified Sharif of the CSP's decision by letter dated May 10, stating "[o]ur final decision was based solely on your academic performance, which has been identified to you on numerous occasions to be substandard." Sharif requested an appeal to the Student Appeals Committee ("SAC").[6]

## D.   The SAC Proceedings

The SAC is a "standing committee consisting of three faculty members appointed by the Dean and not then members of the CSP." Handbook, Student Appeals Committee, p. 17. A student may request a review of a CSP decision before the SAC. Id. Following review, the SAC will either sustain the CSP's decision, or request reconsideration whereby the CSP and SAC vote on the question together. Id. In either alternative, the decision is final. Id.

At its June 5, 1991 meeting, the SAC set June 14 for Sharif's appeal hearing. Following the hearing, the SAC first

---

[6] In early April, Sharif also failed gastroenterology. He argues that his failure was due to the time he had to spend on his hearings before the CSP. He also states that the professor, Dr. Naitove, offered to give him an oral make-up examination. Nevertheless, the failure remains on his transcript.

decided to affirm the CSP's decision to separate Sharif by a divided vote, and then, attempting to achieve greater unanimity, voted to offer him the option to repeat his second year with certain restrictions. Next, the SAC and the CSP met jointly on June 26 to reconsider Sharif's case and their respective decisions. Following discussion, the committees voted together to sustain the CSP's decision to dismiss Sharif based on his academic record. Dr. O'Donnell officially informed Sharif of the decision by a letter dated June 28, and his transcript was inscribed with the notation, "STUDENT SEPARATED FROM DARTMOUTH MEDICAL SCHOOL 6/26/91."

Sharif took the National Board of Medical Examiner's ("NBME") Part I examination at Cornell Medical College in New York City on June 11 and 12. He received a passing score, sent to him on July 23. Sharif's subsequent efforts at reinstatement at Dartmouth and to continue with his class at Brown failed. He applied to many other medical schools but was not accepted.

Sharif filed suit against Dartmouth, members of the CSP and faculty, and a fellow student, Sarah Henry, in November 1993 and filed his final amended complaint on August 15, 1995. The defendants move for summary judgment on all claims, and Sharif also moves for summary judgment.

8

## II.  **STANDARD OF REVIEW**

Summary judgment is appropriate only if the facts taken in the light most favorable to the nonmoving party show that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Guzman-Rivera v. Rivera-Cruz, 29 F.3d 3, 4 (1st Cir. 1994). Where the nonmoving party bears the burden of proof, the moving party initially need allege only the lack of evidence to support the nonmoving party's case.  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  The nonmoving party cannot rely on the pleadings alone to oppose summary judgment, but must come forward with properly supported facts to demonstrate that "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

If the moving party will bear the burden of proof on an issue at trial, the court will grant summary judgment only if: "(1) the moving party initially produces enough supportive evidence to entitle the movant to judgment as a matter of law (i.e., no reasonable jury could find otherwise even when

9

construing the evidence in the light most favorable to the non-movant), and (2) the non-movant fails to produce sufficient responsive evidence to raise a genuine dispute as to any material fact."  Murphy v. Franklin Pierce Law Center, 882 F. Supp. 1176, 1180 (D.N.H. 1994) (citing Fitzpatrick v. Atlanta, 2 F.3d 1112, 1115-17 (11th Cir. 1993)), aff'd, 56 F.3d 59 (1st Cir. 1995) (table).  A "material fact" is one "that might affect the outcome of the suit under the governing law," and a genuine factual issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  When the facts are undisputed, the moving party can prevail only if it is entitled to judgment as a matter of law on the undisputed material facts.  Desmond v. Varrasso (In re Varrasso), 37 F.3d 760, 764 (1st Cir. 1994).  I consider the parties' motions in light of the summary judgment standard.

### III.  DISCUSSION

Sharif asserts federal claims against Dartmouth based on 42 U.S.C.A. § 1981; 42 U.S.C.A. § 2000d (Title VI); and the Fourteenth Amendment alleging discrimination based on his race

10

and ethnicity.  He asserts a due process claim as part of his state law breach of contract claim.  Sharif's state law causes of action against Dartmouth alone are breach of contract, breach of the duty of good faith and fair dealing, and breach of fiduciary duty.  He alleges defamation claims against Dartmouth and individual defendants:  Associate Dean of Student Affairs and CSP Chair, Joseph O'Donnell; CSP members Robert Harris, Donald St. Germain, Martha Regan-Smith, Constance Brinkerhoff, and Michael Gaylor; classmate Sarah Henry; and Physical Diagnosis instructor Lin Brown.  He brings a negligence claim against Andrew Wallace, Dean of Dartmouth Medical School.  He alleges claims for intentional and negligent infliction of emotional distress against Dartmouth, Wallace, O'Donnell, the CSP members, Endocrinology Instructor Lee Witters, Lin Brown, Professors William Layton and Michael Sateia, classmate Henry, and psychiatry small group leader Michaela Crawley.  Finally, he asserts a conspiracy claim against all of the defendants.

I first address Sharif's federal claims beginning with his constitutional claims.  Next, I discuss his state law claims starting with the contract issues.

11

**A.    Federal Claims**

    1.    Constitutional Claims

Sharif alleges that Dartmouth's actions violated his constitutional right to equal protection.  He also includes "due process" in the title of his breach of contract claim although he does not specify any particular due process violations or supporting factual allegations.  In order to maintain either an equal protection or a due process claim, Sharif must show that Dartmouth's allegedly unconstitutional actions were the product of governmental action.  Edmonson v. Leesville Concrete Co., 500 U.S. 614, 619 (1991).  Sharif alleges governmental action based on Dartmouth's receipt of federal funding and association with a Veterans Administration Hospital.

Dartmouth is a private corporate entity.  See Trustees of Dartmouth College v. Woodward, 17 U.S. 518, 633 (1819); Stone v. Dartmouth College, 682 F. Supp. 106, 110 (D.N.H. 1988). "Although the conduct of private parties lies beyond the Constitution's scope in most instances, governmental authority may dominate an activity to such an extent that its participants must be deemed to act with the authority of the government and, as a result, be subject to constitutional constraints."

12

Edmonson, 500 U.S. at 620; accord Lebron v. National R.R.

Passenger Corp., 115 S. Ct. 961, 964 (1995) ("actions of private

entities can sometimes be regarded as governmental action for

constitutional purposes").

Sharif bears "the burden of showing `the State is

responsible for the specific conduct of which [he] complains.'"

Johnson v. Pinkerton Academy, 861 F.2d 335, 337 (1st Cir. 1988)

(quoting Blum v. Yaretsky, 457 U.S. 991, 1004 (1982)).  The

Supreme Court has developed certain tests or principles to guide

the highly fact-specific inquiry of determining whether a private

entity may considered a governmental actor.  See generally

Rockwell v. Cape Cod Hosp., 26 F.3d 254, 257-60 (1st Cir. 1994);

Gerena v. Puerto Rico Legal Servs., 697 F.2d 447, 449 (1st Cir.

1983).  The analysis used in Rendell-Baker v. Kohn, 457 U.S. 830,

840-43 (1982), to decide whether a private school with state

funding was a state actor for purposes of a civil rights claim by

a dismissed teacher is most analogous to this case.

Preliminarily, the receipt of governmental funds does not,

by itself, render a private institution a governmental actor.

Id. at 840-41; Gerena, 697 F.2d at 450.  Instead, the relevant

factors to be considered are: (1) the extent to which Dartmouth's

actions leading to Sharif's dismissal were compelled by federal

13

regulation (the state compulsion test); (2) whether Dartmouth's activities are traditionally reserved for the government (the public function test); and (3) the extent of Dartmouth's interaction with the federal government or agency (the nexus/joint action test).[7] See Rendell-Baker, 457 U.S. at 840-43; Rockwell, 26 F.3d at 258.

Sharif supports his claim by pointing to Dartmouth's federal funding for student financial aid and the federal loans that he received, along with the majority of other medical students. He also cites information provided by Dartmouth that federal funding supplies up to twenty-two percent of the school's annual budget. As previously noted, however, federal funding alone does not make a school's decision to dismiss a student a governmental decision. Rendell-Baker, 457 U.S. at 840.

---

[7] The Rendell-Baker court also considered and rejected a finding of governmental action based upon the "symbiotic relationship test" articulated in Burton v. Wilmington Parking Authority, 365 U.S. 715 (1961). Rendell-Baker, 457 U.S. at 842. Actions of a private entity are attributable to the federal government under the symbiotic relationship test if the government "has so far insinuated itself into a position of interdependence with [that entity] that it must be recognized as a joint participant in the challenged activity." Burton, 365 U.S. at 725. Sharif has offered no evidence to support a finding of governmental action under the symbiotic relationship test.

Dartmouth states by its counsel's affidavit that the campus is privately owned and that it functions with complete autonomy from both the state and federal governments as to its academic standards. The affidavit also states that Dartmouth evaluates academic performance and degree eligibility based on its own criteria. Although Dartmouth complies with various state and federal regulations, Dartmouth's counsel is aware of no federal regulations governing Dartmouth's evaluation of academic performance. Further, Dartmouth's medical school function is not a function traditionally reserved for governmental action. See Johnson, 861 F.2d at 338 (maintaining educational institutions not an exclusive public function and private high school not state actor despite state attendance requirements); Krohn v. Harvard Law School, 552 F.2d 21, 24 (1st Cir. 1977) ("the mere offering of an education, regulated by the State, does not imbue defendant's activities with sufficient 'public interest' to render defendant's activities governmental in nature"); c.f. Krynicky v. University of Pittsburgh, 742 F.2d 94, 101-03 (3d Cir. 1984) (statutory link between universities and state so extensive as to make them instrumentalities of the state), cert. denied, 471 U.S. 1015 (1985). Accordingly, Sharif's claim fails the state compulsion and public function tests.

15

Sharif next argues that the relationship between the Veterans Administration Hospital in White River Junction, Vermont, and Dartmouth establishes governmental action under the nexis/joint action test. Although the evidence shows a cooperative arrangement between Dartmouth and the Hospital, Sharif has not shown a sufficient connection between the Hospital and Dartmouth's actions and decisions affecting him to establish that Dartmouth was a joint actor with the Hospital. Nor has he shown that the Hospital controlled, affected, or mandated Dartmouth's academic standards or its decision-making as to the qualifications of its students. See Rockwell, 26 F.2d at 258 (Medicare funds and regulation insufficient to make a private hospital a governmental actor); Tynecki v. Tufts Univ. Sch. of Dental Medicine, 875 F. Supp. 26, 31 (D. Mass. 1994) (private dental school's decision to expel student not motivated by the state despite governmental regulation and its participation in government projects). Thus, Sharif has failed to sustain his burden of showing that Dartmouth operated as a governmental actor in making its decision to dismiss him from the program. Absent governmental action, his constitutional claims must fail.

2. The Section 1981 Claim

Section 1981 provides in pertinent part that "all persons

16

within the jurisdiction of the United States shall have the same right in every state to make and enforce contracts . . . as is enjoyed by white citizens . . . ."  42 U.S.C.A. § 1981(a) (1994). The Civil Rights Act of 1991 amended § 1981 to specify that "the term `make and enforce contracts' includes the making, performance, modification and termination of contracts and the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship."  42 U.S.C.A. § 1981(b) (1994). Prior to November 21, 1991, when this amendment became effective, the term "make and enforce contracts" had been interpreted more narrowly to apply only to "conduct at the initial formation of the contract and conduct which impairs the right to enforce contract obligations through the legal process." Patterson v. McLean Credit Union, 491 U.S. 164, 179-80 (1989).

Sharif's § 1981 claim is governed by the version of the statute that was in effect prior to the 1991 amendment because all of the conduct at issue occurred prior to that date. Rivers v. Roadway Express, Inc., 114 S. Ct. 1510-1519-20 (1994) (1991 amendments do not apply to preenactment conduct). Accordingly, Sharif's claim necessarily fails because it is based on conduct that occurred after his contract with Dartmouth was formed and his claim is unrelated to any effort to enforce his contract

17

rights through legal process.

3. The Title VI Claim

**a. The legal standard**

Sharif alleges that Dartmouth violated Title VI by discriminating against him in the actions that culminated in his dismissal. Title VI provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."[8] 42 U.S.C.A. § 2000d (1994). "Title VI itself directly reache[s] only instances of intentional discrimination" although "actions having an unjustifiable disparate impact on minorities [can] be redressed through agency regulations designed to implement the purposes of Title VI." Alexander v. Choate, 469 U.S. 287, 293 (1985) (interpreting the plurality opinion in Guardians Ass'n v. Civil Serv. Comm'n, 463 U.S. 582 (1983)); see also Latinos Unidos De Chelsea En Accion (Lucha) v. Secretary of Housing and Urban Dev., 799 F.2d 774, 783 (1st Cir. 1986). Because Sharif does not base

---

[8] For purposes of this analysis, I will assume that the Dartmouth Medical School program receives federal financial assistance within the meaning of the statute.

his Title VI claim on any of the statute's implementing regulations, he must show that Dartmouth intentionally discriminated against him based on his race, color, or national origin.

The First Circuit has not determined whether it would apply the familiar burden-shifting standard used in Title VII disparate treatment cases to similar claims under Title VI. See McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); St. Mary's Honor Ctr. v. Hicks, 113 S. Ct. 2742 (1993). However, other courts have used the Title VII burden-shifting standard to resolve disparate treatment claims under Title VI. See, e.g., Enplanar, Inc. v. Marsh, 11 F.3d 1284, 1294 (5th Cir.) (combined § 1981 and Title VI case), cert. denied, 115 S.Ct. 312 (1994); Hankins v. Temple Univ., 829 F.2d 437, 440 (3d Cir. 1987) (combined Title VI and VII case); New York State Ass'n for Retarded Children v. Carey, 612 F.2d 644, 649 (2d Cir. 1979) (addressing Rehabilitation Act and assuming that burden-shifting standard is "a general principal of discrimination law" applicable in Title VI cases); Wade v. Mississippi Cooperative Extension Serv., 528 F.2d 508, 516-18 (5th Cir. 1976) (combination of discrimination claims including Title VI); Love v. Duke Univ., 776 F. Supp. 1070, 1073 (M.D.N.C. 1991) (Title VI), aff'd, 959 F.2d 231

19

(1992); <u>Police Officers for Equal Rights v. City of Columbus</u>, 644 F. Supp. 393, 438 (S.D. Ohio 1985) (Title VI claim). Finding no contrary authority, I assume that the First Circuit would apply the Title VII burden-shifting analysis in the present case.[9]

The Title VII burden-shifting analysis in disparate treatment cases is a three-step process. <u>Texas Dept. of Community Affairs v. Burdine</u>, 450 U.S. 248, 252-53 (1981) (citing <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973)). To begin, Sharif must make a prima facie case of discrimination by providing evidence that: (1) he is part of a class protected by Title VI; (2) his performance at Dartmouth was satisfactory; (3) he was dismissed; and (4) the circumstances of his dismissal support an inference that Dartmouth's actions were motivated by his racial or ethnic identity. <u>See</u> <u>Hicks</u>, 113 S. Ct. at 2747; <u>Udo v. Tomes</u>, 54 F.3d 9, 12 (1st Cir. 1995); <u>Lipsett</u>, 864 F.2d at 899. If he establishes a prima facie case of discrimination, a

_____

[9] In the context of Title IX claims, the First Circuit has limited the application of the Title VII burden-shifting standard to proof of discrimination in training or employment. <u>Cohen v. Brown University</u>, 991 F.2d 888, 901 (1991); <u>Lipsett v. University of Puerto Rico</u>, 864 F.2d 881, 896-97 (1st Cir. 1988). The distinctions found in the circuit's Title IX decisions would not bar the application of the Title VII standard in this case.

low threshold, he creates a rebuttable presumption that Dartmouth intentionally discriminated against him. Hicks, 113 S. Ct. at 2747; Smith v. Stratus Computer, Inc., 40 F.3d 11, 15 n.4 (1st Cir. 1994) (burden is not onerous), cert. denied, 115 S.Ct. 1958 (1995). At this stage, although the burden of production shifts to Dartmouth, the burden of persuasion as to Dartmouth's discriminatory intent remains with Sharif throughout the analysis. Byrd v. Ronayne, 61 F.3d 1026, 1030 (1st Cir. 1995), cert. denied, 116 S. Ct. 914 (1996).

To rebut the presumption of discriminatory intent, Dartmouth must produce evidence which, if "taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action." Hicks, 113 S. Ct. at 2748; accord Burdine, 450 U.S. at 253; Smith v. F.W. Morse, No. 95-1556, 1996 WL 46919, at *4 (1st Cir. Feb. 12, 1996). If Dartmouth carries its burden of production, the presumption of discrimination "'drops out of the picture.'" Woodman v. Haemonetics Corp., 51 F.3d 1087, 1091 (1st Cir. 1995) (quoting Hicks, 113 S. Ct. at 2749).

At the third stage, Sharif, still shouldering the burden of proving Dartmouth's intentional discrimination, "must proffer 'sufficient admissible evidence, if believed, to prove by a preponderance of the evidence each essential element in a prima

21

facie case and that the employer's justification for the challenged employment action was merely a pretext for impermissible . . . discrimination.'" Byrd, 61 F.3d at 1031 (quoting Hicks, 113 S. Ct. at 2749). At least one circuit has interpreted dicta in Hicks to entitle a plaintiff to submit her claim to a jury if she proves her prima facie case and shows that the defendant's reason was false. See Anderson v. Baxter Healthcare Corp., 13 F.3d 1120, 1123 (7th Cir. 1994). The First Circuit, however, has determined that proof of a prima facie case and evidence of pretext will suffice only if the factfinder could reasonably conclude from all of the evidence presented that impermissible discrimination was the real reason for the defendant's adverse action. Barbour v. Dynamics Research Corp., 63 F.3d 32, 39 (1st Cir. 1995); Udo, 54 F.3d at 13; Smith, 40 F.3d at 16; Woods v. Friction Materials, 30 F.3d 255, 260-61 n.3 (1st Cir. 1994). In other words, Title VI, like Title VII, does not provide relief from unfair decisions "unless the facts and circumstances indicate that discriminatory animus was the reason for the decision." Smith, 40 F.3d at 16; accord Dartmouth Review v. Dartmouth College, 889 F.2d 13, 19 (1st Cir. 1989). Accordingly, proof of a prima facie case plus pretext will be enough to survive summary judgment only if the plaintiff can also

22

prove that the stated reason was a pretext for a discriminatory reason. I apply the First Circuit standard in evaluating Sharif's claim.

**b. Analysis**

Dartmouth has produced substantial evidence in support of its contention that Sharif was dismissed because of his poor academic performance. Therefore, even if Sharif has demonstrated a prima facie case, something I do not decide, he cannot survive Dartmouth's challenge to his Title VI claim unless he can produce enough evidence to permit a reasonable factfinder to conclude that Dartmouth's proffered reason was a mere pretext for racial or ethnic discrimination.

Sharif has offered several types of evidence to support his Title VI claim. First, he cites statements by Dr. Naitove and other evidence suggesting that the CSP had allowed worse students to take reexaminations and to remain in the program. Second, he points to evidence suggesting that the CSP's decision was based, at least in part, on the fact that Sharif behaved differently from the other students. Finally, Sharif offers what he considers to be evidence that his failing grade in endocrinology was unwarranted. This evidence is insufficient to permit a reasonable factfinder to conclude that Dartmouth's explanation is

23

a mere pretext for discrimination.

Evidence suggesting that Dartmouth allowed worse students of unidentified racial and ethnic backgrounds to take reexaminations and remain in the program may be sufficient to support a finding of pretext, but it is not sufficient to support a finding that Dartmouth's stated reason for dismissing Sharif was a pretext for unlawful discrimination. If academic performance were defined narrowly to include only grades, it may well be that Dartmouth did not dismiss Sharif, as it claimed, solely because of his poor academic performance because there is evidence in the record to suggest that some members of the CSP were influenced by Sharif's strange behavior as well as his poor grades. However, Sharif has not offered a shred of evidence to link his "strange" behavior to his race or ethnic background.[10] Nor has he offered any other evidence that would permit a reasonable factfinder to conclude that the real reason for his dismissal was his race or ethnic background. Standing alone, this evidence is insufficient to

---

[10] To the contrary, the concerns expressed by CSP members about Sharif's inability to interact appropriately with patients and peers transcends race or ethnicity and focuses on skills necessary to the medical profession. See, e.g., Regents of Univ. of Mich. v. Ewing, 474 U.S. 214, 227-28 (1985); Bina v. Providence College, 39 F.3d 21, 24 (1st Cir. 1994), cert. denied, 115 S.Ct. 1406 (1995).

establish a triable case of racial discrimination.

Nor am I persuaded by his evidence challenging his failing endocrinology grade. As the Supreme Court has acknowledged, "[c]ourts are particularly ill-equipped to evaluate academic performance." The Board of Curators of the Univ. of Mo. v. Horowitz, 435 U.S. 78, 92 (1978). In the absence of some evidence permitting a conclusion that other students of different racial or ethnic backgrounds were subject to a different grading standard, Sharif's evidence of vindictive grading is unpersuasive.

In summary, Sharif has failed to produce any evidence to support his discrimination claim. As the First Circuit acknowledged in a similar case involving Dartmouth, "merely juxtaposing the fact of one's race with an instance of discrimination is insufficient" to establish "a causal link between the defendants' conduct and plaintiffs' race." Dartmouth Review, 889 F.2d at 19.[11]

---

[11] Even if Sharif's § 1981 claim were not barred for the reasons discussed previously, it too would fail for lack of evidence of intentional discrimination. See Alexis v. McDonald's Restaurants of Mass., 67 F.3d 341, 347 (1st Cir. 1995) (citing General Bldg. Contractors Ass'n v. Pennsylvania, 458 U.S. 375, 391 (1982)).

**B.    State Law Claims**

Sharif brings state law claims alleging breach of contract, breach of the duty of good faith and fair dealing, breach of fiduciary duty, negligence, defamation, negligent and intentional infliction of emotional distress, and conspiracy against Dartmouth, CSP and faculty members, and a classmate who were involved in his experiences at Dartmouth.  I examine his claims and the proof he offers in light of the summary judgment standard.

1.  Claims Based on the Handbook

Sharif charges Dartmouth with breach of contract, breach of the duty of good faith and fair dealing, and breach of fiduciary duties, all based on his interpretation of the Handbook. I begin with the breach of contract claims and then address the breach of good faith and fiduciary duty claims.

a.  **Breach of contract**

The parties agree that the Handbook acts as a contract between Dartmouth and its students.  See Ross v. Creighton Univ., 957 F.2d 410, 416 (7th Cir. 1992).  Sharif contends that Dartmouth breached several provisions of the Handbook.

As in all contract disputes, the interpretation of an unambiguous contract presents a question of law.  Gamble v.

26

<u>University of N.H.</u>, 136 N.H. 9, 13 (1992) (quoting <u>Goodwin R.R.,</u> <u>Inc. v. State</u>, 128 N.H. 595, 602 (1986)). The meaning of the contract depends upon the objective intent of the parties at the time the contract was made. <u>Id.</u> The parties' intent is determined from the terms of the agreement taken as a whole, and the meaning is that which a reasonable person in the parties' position would understand. <u>Id.</u> If the parties could reasonably differ as to the meaning of a contract provision, it is ambiguous and extrinsic evidence may be considered. <u>Id.</u> However, such an ambiguity must be resolved by the trier of fact unless, considering all of the evidence, a rational factfinder could resolve the ambiguity in only one way. <u>Gamble</u>, 136 N.H. at 15 (court determined meaning of ambiguous contract where, upon consideration of extrinsic evidence, only one interpretation was reasonable); <u>Public Service v. Seabrook</u>, 133 N.H. 365, 370 (1990) (ambiguous contract presents a question of fact).

The New Hampshire Supreme Court has recognized that interpreting a contract between a university and its students requires consideration of the academic context of the agreement. <u>Gamble</u>, 136 N.H. at 13 (citing <u>Lyons v. Salve Regina College</u>, 565 F.2d 200, 202 (1st Cir. 1977), <u>cert. denied</u>, 435 U.S. 971 (1978)). The court determined that "although the first step of

27

the analysis is to examine the language of the contract under the basic tenets of contract law, the parties' unique relationship must also be considered." Gamble, 136 N.H. at 13. Other courts have interpreted the unique relationship in the university context to require that an academic institution's decisions concerning a student's academic evaluation be given deference, while procedural issues are reviewed under ordinary rules of contract construction. See, e.g., Doherty v. Southern College of Optometry, 862 F.2d at 577; Fellheimer v. Middlebury College, 869 F. Supp. 238, 243 (D.Vt. 1994). I begin with Sharif's claims based on the Handbook's procedural provisions, and then address his challenges to Dartmouth's academic decisions.

(i) Procedures

Sharif challenges the procedures employed by the CSP in making and affirming the decision to dismiss him. First, he contends that the CSP violated the Handbook by excluding him from its meeting on February 27, 1991, when the CSP made its initial decision to dismiss Sharif. The Handbook provides in the section titled "Committee on Student Performance": "A student shall be entitled to a hearing before the CSP in any case which may involve possible suspension or separation." Handbook at 16. Sharif argues that the cited provision means he was entitled to

28

attend the CSP initial meeting in February as well as the later CSP appeal hearings. The next section, "Rights of Students," provides the procedures applicable to appeals hearings before the CSP.[12]

Contrary to Sharif's interpretation, however, the Handbook contains no provision for students to attend any CSP meetings other than appeals hearings. Consequently, based on the Handbook, Sharif was entitled to an appeal hearing before the CSP, which he received, but was not entitled to attend the February meeting. Therefore, his contract claim that he was not notified of the charges against him before the February meeting, and not given an opportunity to prepare, to testify and present evidence, or examine the evidence and witnesses against him there

_____

[12] The provisions Sharif relies on are in the "Rights of Students" section:

Paragraph 3: "A student shall have a reasonable time to prepare his or her case after receiving the charge."

Paragraph 4: "Notification of the charges against a student shall be made in writing. Such notification shall indicate the regulation or regulations allegedly violated and shall contain a concise statement of the reported facts which constitute the violation or violations."

Paragraph 9: "The student shall have the right to hear and cross-examine all witnesses and to examine all other evidence introduced against him or her."

Paragraph 10: "The student shall have the right to testify and present evidence and witnesses in his or her own behalf."

29

is meritless.

Sharif next argues that the CSP based its decision to dismiss him on "unsubstantiated, rank hearsay and student-faculty rumors" introduced at the first appeal hearing in violation of his rights in the Handbook.[13] The evidence he cites, a letter from Dr. Lin Brown describing a report by another student that Sharif's fiancee was present during a physical diagnosis class examination, was introduced at the March 27 hearing. Sharif admits, however that Dr. Brown retracted and corrected her letter prior to the second appeal hearing. Moreover, Sharif received advance notice of all evidence to be considered at the second hearing, was represented by counsel at the hearing, and he does not challenge the procedures afforded him at that time. Thus, any procedural unfairness that may have occurred at the first hearing was cured by the subsequent hearing.

Sharif also contends that the CSP members were impermissibly

---

[13] Paragraph 8 of the "Rights of Students" section provides: "In each case, the CSP shall base its decisions solely on evidence introduced at the hearing." Paragraph 11 provides: "Formal rules of evidence shall not apply and the CSP may consider any testimony or evidence it considers to be trustworthy and to have probative value. The CSP may exclude any testimony or evidence it considers to be unduly repetitious or immaterial to the issue before it, or to have been improperly obtained."

biased against him in violation of the Handbook requirement.[14] Sharif provides no evidence of bias other than that the CSP repeatedly affirmed its initial decision to dismiss him. He did not challenge the impartiality of any CSP members during the hearings process. The Handbook does not define prohibited bias, but borrowing the constitutional due process standard,[15] the record does not support Sharif's allegations of bias.

Finally, Sharif argues that Dartmouth colluded with his classmate, Sarah Henry, and unnamed others to disseminate "false accusations, hearsay and speculations" about him in violation of

---

[14] "Rights of Students" paragraph 6 provides:
A member of the CSP who has a special bias or interest which would prevent him or her from judging the case impartially shall disqualify himself or herself from adjudication of the case. The student may challenge a member on such grounds. In this case the decision on disqualification shall be decided by a majority vote of the CSP members present and voting.

[15] To show bias in violation of the right to due process, Sharif would have to "overcome a presumption of honesty and integrity in those serving as adjudicators" by identifying an influence strong enough that it "poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented." Withrow v. Larkin, 421 U.S. 35, 47 (1975). A speculative, contingent, or remote interest does not violate the due process requirement. Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 826 (1986).

the Handbook's "Conduct Regulations."[16]  The conduct regulations
obligate a student to abide by certain standards and may be
enforced by Dartmouth.  However, Sharif has no contractual right
to enforce those provisions against other students or Dartmouth
in this context.

(ii)  Academic provisions

Sharif contends that Dartmouth's decision not to allow him
to retake the endocrinology examination breached his rights under
the Handbook.  He cites the Handbook provision stating that:  "A
student who fails one course during a single academic year shall
ordinarily be permitted a re-examination.  Please refer to
Paragraph #9."  Handbook, Academic Regulations, ¶4.  Paragraph 9
states:  "Permission for any re-examination must be given by the
Office of Academic Affairs, which will determine the date of the
re-examination in consultation with the course director.  No more
than one re-examination per course will be permitted."  At the
time he failed endocrinology, it was his only failure in that

---

[16]  Sharif cites the following paragraphs:
"2. No student shall furnish false information to the medical school with an intent to deceive"; and
"5. No student shall conduct himself or herself in a manner which fails to meet the standards of the medical profession or which interferes with the educational process."

academic year.  Dartmouth contends that it fulfilled its obligations under the Handbook.

First, the use in the regulation of the qualifying term "ordinarily" affords Dartmouth a measure of discretion in whether to allow a reexamination.  Ordinarily means, in everyday parlance, "most of the time; generally; usually." Random House Unabridged Dictionary 1363 (2d ed. 1993).  Thus, the Handbook did not guarantee that students would always be allowed reexamination, but provided only that reexamination would usually be allowed, giving Dartmouth discretion to determine whether or not to allow a reexamination in particular circumstances.  It is undisputed that the endocrinology faculty, who are authorized by the Handbook[17] to establish the requirements for the course, explained that Sharif would fail endocrinology even if he were to pass a reexamination.  This academic judgment is entitled to substantial deference.  Ewing, 474 U.S. at 226.  Thus, because of the unusual circumstances of Sharif's case, in which a reexamination would not cure the course failure, the faculty's

_____

[17]  The Handbook provides under "Academic Regulations" at Paragraph 2:  "Each course has requirements for completion, which are established by the faculty teaching that course.  If these requirements are not met the result will be a failing grade and review by the Committee on Student Performance."

decision not to allow a reexamination, affirmed by the CSP, fell within the discretion allowed in Paragraph 4.

Next, Sharif argues that the CSP voted to separate him prematurely, in violation of the Handbook, as he had failed only one course, endocrinology, at the time of the CSP's initial decision in February. Paragraph 8 provides that a student who fails two or more courses during the four year program, "with or without re-examination," is subject to review by the CSP who may recommend separation. Handbook at 14. Paragraph 3 provides, "In evaluating students with current academic deficiencies, the Committee on Student Performance will review and take into account their entire academic records, weighing low passes, and previous failures that were subsequently made up by re-examination, as well as current failures and low passes." Id. Thus, taken in the context of the Academic Regulations as a whole, it is clear that a course failure, although it is later converted to a pass following a reexamination, continues to be significant in evaluating a student's overall academic performance. Although the CSP is not required to dismiss a student with two course failures, it may exercise its discretion to do so. Because Sharif failed neuroanatomy in his first year, although he passed with a reexamination, he was subject to review

34

and possible dismissal when he failed endocrinology. Even if Sharif had been allowed a reexamination in endocrinology and if he had then passed the course, he would still have been subject to CSP review because he received two course failures. Accordingly, the Handbook did not prevent Dartmouth from reviewing Sharif's status and dismissing him following the second course failure.

As no reasonable juror could find that Dartmouth breached any Handbook provisions, Dartmouth is entitled to summary judgment as to all of the breach of contract claims.

### b. Breach of Implied Duty of Good Faith and Fair Dealing

Sharif alleges that Dartmouth breached its implied duty of good faith and fair dealing by not showing reasonable sensitivity to him, by not stopping his fellow students' "subterfuge" against him, by not allowing him a reexamination in endocrinology despite his passing grade on the NBME Part I, by not providing an equitable appeals process, and by not writing a recommendation for him to transfer out of Dartmouth at the end of his second year. In essence, he argues that Dartmouth acted unreasonably or in bad faith in the way it exercised its discretion provided in the Handbook.

35

Sharif's good faith and fair dealing claim fits the category of cases under New Hampshire law that address good faith in discretionary contract performance.[18]  See Centronics Corp. v. Genicom Corp., 132 N.H. 133, 139 (1989).  Under the Centronics standard, when

> an agreement that appears by word or silence to invest one party with a degree of discretion in performance sufficient to deprive another party of a substantial proportion of the agreement's value, the parties' intent to be bound by an enforceable contract raises an implied obligation of good faith to observe reasonable limits in exercising that discretion, consistent with the parties' purpose or purposes in contracting.

Id. at 143.  In this case, Dartmouth and Sharif agreed to comply with the terms of the Handbook, and the Handbook conferred discretion on Dartmouth to make decisions related to academic qualifications of students.  See, e.g., Bilut v. Northwestern Univ., 645 N.E.2d 536, 542 (Ill.App.Ct. 1994) ("The foundation of [the relationship] is the understanding that the students will abide by and adhere to the disciplinary regulations and the academic standards established by the faculty and the university;

---

[18]  I need not address Dartmouth's claim that schools do not owe their students an implied duty of good faith and fair dealing because I conclude that Sharif has produced insufficient evidence to support a good faith and fair dealing claim even if such a duty exists in this context.

36

and that upon successful completion of their studies, they will be awarded a degree."), app. denied, 649 N.E.2d 413 (Ill. 1995).

Courts have afforded broad discretion to schools making academic decisions. See, e.g., Ewing, 474 U.S. at 226 (federal courts are not suited "to evaluate the substance of the multitude of academic decisions . . . that require 'an expert evaluation of cumulative information and [are] not readily adapted to the procedural tools of judicial or administrative decisionmaking'" (quoting Horowitz, 435 U.S. at 89-90)). See also Ross, 957 F.2d at 416 (courts are not qualified to review academic qualifications of students); Doherty, 862 F.2d at 577-78) (arbitrary and capricious standard applied to college's change in degree requirements); Frederick v. Northwestern Univ. Dental School, 617 N.E.2d 382, 387 (Ill.App.) (arbitrary, capricious, or bad faith standard applied to adverse decision for academic deficiencies), appeal denied, 622 N.E.2d 1204 (1993); Bleicher v. University of Cincinnati College of Medicine, 604 N.E.2d 783, 788 (Ohio Ct. App. 1992) (same). Further, an academic decision may be based appropriately on a broad view of the student's performance including his or her suitability for the profession. Ewing, 474 U.S. at 227-28; Horowitz, 435 U.S. at 91 n.6.

In Horowitz, the Supreme Court reviewed the university's decision to dismiss a medical student for due process violations. The university's decision was based on deficiencies in her clinical competency including that her performance with patients was below par, her attendance was erratic, and her personal hygiene was poor. Id. The Court refused to intrude into the university's decision since it "rested on the academic judgment of school officials that she did not have the necessary clinical ability to perform adequately as a medical doctor." Id. at 89-90. Similarly, in Ewing, the Supreme Court noted that the University could properly consider as part of its academic evaluation that the student's "sensitivity to difficulties in his personal life suggested an inability to handle the stress inherent in a career in medicine" and other activities that revealed "a lack of judgment and an inability to set priorities." Ewing, 474 U.S. at 227 n.13. See also Alanis v. University of Tex. Health Science Ctr., 843 S.W.2d 779, 785 (Tx.Ct.App. 1992) (suitability to practice medicine is an academic qualification). These precedents are instructive when considering how the New Hampshire Supreme Court is likely to interpret the duty of good faith and fair dealing in the academic context.

38

It is undisputed that Sharif's grades were poor during both years and that he was on Academic Notice during most of his time at Dartmouth. Under the terms of the Handbook, as I have shown above, Dartmouth had discretionary authority to deny him a re-examination in endocrinology and to separate him from the program based on his grades. The record establishes beyond reasonable dispute that Dartmouth decided not to allow Sharif to stay because of his overall academic performance. In addition to his poor grades, the CSP considered his erratic course attendance, his failure to meet course requirements, his problems with fellow students and negative evaluations in clinical programs, and his failure to change his approach to medical school even after his errors were discussed with him. Sharif has not shown that the aspects of his performance considered by the CSP were not reasonable considerations for evaluating the qualifications of a medical student or doctor. Nor has he produced any credible evidence to support his claims that the CSP's concerns were merely a proxy for race or ethnic discrimination. Therefore, based on the record, Dartmouth's exercise of its discretion to expel Sharif based on his poor academic performance, coupled with poor prospects for success, could not be considered by a reasonable factfinder to be unreasonable. Therefore, Sharif's

39

breach of good faith and fair dealing claim necessarily fails.

### c. Breach of Fiduciary Duty

To maintain a claim against Dartmouth for breach of a fiduciary duty, Sharif must first show that a fiduciary relationship existed with Dartmouth. Under New Hampshire law, a fiduciary relationship may exist in "a variety of circumstances, and does exist in cases where there has been a special confidence reposed in one who, in equity and good conscience, is bound to act in good faith and with due regard to the interests of the one reposing the confidence." Lash v. Cheshire County Sav. Bank, 124 N.H. 435, 439 (1984) (quotation omitted). The duty is breached when the "influence has been acquired and abused or confidence has been reposed and betrayed." Id. at 438 (quotation omitted).

As I have already noted, Sharif has produced insufficient evidence to support his claim that Dartmouth acted unreasonably in denying him a reexamination in endocrinology or in dismissing him from school. For the same reasons, Sharif's breach of fiduciary duty claim cannot survive even if Dartmouth owed him a fiduciary duty.

### 2. Defamation Claims

Sharif brings claims for libel and slander in different counts. Because both libel and slander are evaluated as

40

defamatory statements, I need not distinguish between them. See Morrissette v. Cowette, 122 N.H. 731, 733 (1982); Restatement, Second, Torts § 568 (1977).

To prove defamation under New Hampshire law, a private individual plaintiff must show that the "defendant failed to exercise reasonable care in publishing, without a valid privilege, a false and defamatory statement of fact about the plaintiff to a third party." Independent Mechanical Contractors, Inc. v. Gordon T. Burke & Sons, Inc., 138 N.H. 110, 118 (1993); accord Duchesnaye v. Munro Enters., 125 N.H. 244, 250 (1984). A statement is defamatory only if it "tends to lower the plaintiff in the esteem of any substantial and respectable group of people." Nash v. Keene Publishing Corp., 127 N.H. 214, 219 (1985). Statements that are substantially true are not actionable. Simpkins v. Snow, 661 A.2d 772, 777 (N.H. 1995).

Opinions can serve as the basis for a defamation claim if the opinion reasonably implies false and defamatory facts. Milkovich v. Lorain Journal Co., 497 U.S. 1, 20-21 (1990); Duchesnaye, 125 N.H. at 249. However, a statement of opinion is not actionable unless it is "sufficiently factual to be susceptible of being proved true or false." Milkovich, 497 U.S. at 21; accord Phantom Touring, Inc. v. Affiliated Publications,

41

953 F.2d 724, 727-28 (1st Cir.), cert. denied, 504 U.S. 974 (1992). Further, an opinion cannot serve as the basis for a defamation action if it is apparent from the surrounding context that the opinion is based solely on disclosed non-defamatory facts. Standing Committee on Discipline of the U. S. Dist. Court for the Cent. Dist. of Cal. v. Yagman, 55 F.3d 1430, 4439 (9th Cir. 1995); Nash, 127 N.H. at 219; Restatement (Second) of Torts §§ 566, cmt. c (1977) ("A simple expression of opinion based on disclosed . . . nondefamatory facts is not itself sufficient for an action of defamation, no matter how unjustified and unreasonable the opinion may be or how derogatory it is.").

New Hampshire recognizes a conditional privilege for statements that "although untrue, were published on a lawful occasion, in good faith, for a justifiable purpose, and with a belief, founded on reasonable grounds of its truth" as long as the statements were not made with actual malice. Simpkins, 661 A.2d at 777 (internal quotation omitted). I examine the challenged statements in light of the applicable standard.

### (a) Statements about Sharif's fiancee's visit to physical diagnosis class.

Sharif challenges several statements about an incident in which Sharif invited his fiancee to attend a pelvic examination,

which was part of his physical diagnosis class.  Dr. Lin Brown,

Director of Physical Diagnosis, wrote to Dr. O'Donnell on March

25, 1991, as follows:

> I[t] has come to my attention through a member of the
> DMS 2 class that Adil Sharif's fiancee attended the
> teaching session on the pelvic exam, including
> examining a teaching assistant.  Her non-medical
> student status was never identified to the program
> coordinator but the students in the group were
> understandably upset.  I bring their concerns to your
> attention.

Her letter was included in the information provided to the CSP at

the March 27 hearing.  Dr. O'Donnell stated in his opening

remarks at the hearing:

> He did not identify to instructor (Lin Brown) that this
> was not a medical student and so the simulated patient
> who is the one being examined didn't know that in the
> room was a non-medical student.

The incident was then discussed with Sharif and among the CSP

members.  On March 29, Dr. Brown corrected her original report in

the following letter:

> Since my letter dated 3/26/91 [3/25/91] concerning
> Adil Sharif and his fiancee, I have spoken with Elsa
> Lind, the gynecology teaching assistant coordinator.
> This conversation does contradict the student
> informer's account of the incident.  Adil did ask Ms.
> Lind about his fiancee's participation & got both
> Elsa's & the teaching assistant's approval.  Although I
> still feel that Adil's judgement could be questioned
> concerning inviting his fiancee in the first place, he
> did indeed secure permission.

43

> Obviously, I am to blame for not asking for Ms. Lind's account earlier, but I did accurately portray the student informer's concerns & conversations with me.

Sharif charges that the harm to him due to the false and defamatory account of the incident was irreparable despite Dr. Brown's clarification.

Dr. Brown's original report to Dr. O'Donnell passed along information to the head of the CSP as it had been reported to her by a member of the class. The CSP was the appropriate body to receive and evaluate the information. Therefore, Dr. Brown is protected from liability by the conditional "good faith" privilege unless she acted maliciously. See Simpkins, 661 A.2d at 777. Sharif has not shown malice. Therefore, he cannot premise a defamation claim on Dr. Brown's letter.

Similarly, to the extent Sharif bases defamation claims against Dr. O'Donnell or other members of the CSP on their remarks based on Dr. Brown's letter, those statements were reasonably based on the information in the letter and made in the context of the CSP meeting. He has not shown that the CSP members acted with malice in discussing the incident reported in Dr. Brown's letter. Thus, their statements are also protected by the conditional "good faith" privilege.

44

### (b) Other statements made during the March CSP hearing

Sharif challenges many statements made by CSP members during the March 27 hearing. In general, the challenged statements are not actionable because they are either based on disclosed nondefamatory facts or they are not sufficiently factual to be susceptible of proof. For instance, Sharif charges that Dr. Harris defamed him by stating, "And I think he's shown clearly over the two years numerous episodes of at least poor judgment and, at the worst, inappropriate behavior bordering on medical ethics breaching." He prefaced his opinion by stating, "I think we have to consider the behavioral issues here because they're extremely important." The behavioral issues Dr. Harris was referring to were disclosed in the context of the discussion including Sharif's poor attendance in endocrinology and other classes, inviting his fiancee to the physical diagnosis class, and his problems in interviews in two classes. Dr. Harris's evaluation of Sharif's performance is simply his opinion based on disclosed facts.

In addition, all of the statements are protected by the conditional "good faith" privilege because they were made by CSP members about matters under consideration at the hearing in the

45

context of CSP proceeding. Thus, all of the statements were made "on a lawful occasion" and for "a justifiable purpose" and the information at the hearing provided a reasonable basis for belief. See Simpkins, 661 A.2d at 776-77. Despite Sharif's conclusory statements that the defendants acted with malice against him, he has presented no evidence of actual malice by any of the CSP members toward him.

### (c) Sarah Henry's statements

Sharif alleges that his fellow classmate, Sarah Henry, "reported personally biased views about Plaintiff's character and behavior to not only other students but also several faculty." Specifically, he challenges her statements about his behavior in their small group psychiatry session that he had arrived forty-five minutes late, that he had attended only two sessions, and that he was being seductive in his interview style. Her statements were substantially corroborated by Dr. Michael Kligman and Micaela Crawley of the psychiatry small group staff and Sharif does not contest the truth of the essential facts on which Henry based her characterizations of his behavior. Thus, being substantially true, her statements are not actionable.

In the other incidents Sharif cites, the "bad egg" statement was made only to him and thus was not "published." He describes

46

Henry's disapproval of his inquiry of a patient in a physiology course and a previous altercation between them in the psychiatry group session, but he does not provide specific allegedly defamatory statements that Henry made about him in either incident. Thus, those allegations cannot be reviewed. Despite evidence of Sarah Henry's dislike for Sharif and of her outspoken criticism of him, the incidents he recounts do not amount to defamation. Summary judgment is granted in her favor.

### (d) Academic statements

Next, Sharif challenges Dr. O'Donnell's letter dated May 9, 1991, to Dr. Stephen R. Smith, Associate Dean of Medicine at Brown University School of Medicine that states: "Adil Sharif will not be coming to Brown this year with the rest of the group because of academic difficulties." He argues that the letter was premature, and therefore false, because he had not exhausted the appeals process. By May 9, the CSP had voted to dismiss him in February and affirmed the decision in March and again on May 8. Thus, as of May 9, Dr. O'Donnell's statement was true that Sharif would not go to Brown with his class. As things transpired, the dismissal decision was affirmed in the appeals process. Thus, the letter was true when sent, remained true when the appeals process terminated, and had no defamatory effect.

Finally, Sharif argues that the notation on his transcript, "STUDENT SEPARATED FROM DARTMOUTH MEDICAL SCHOOL 6/26/91," "besmirched" his academic standing. The notation, being true, is not actionable. Summary judgment is granted in favor of all defendants as to Sharif's defamation claims.

3. Negligence

Sharif alleges negligence claims against Dean Wallace, Dr. O'Donnell, Dr. Brown, and Dartmouth based on their actions and failures to act during his tenure at Dartmouth and particularly in the dismissal process. To prove a claim of negligence, a plaintiff must show "the existence of a duty flowing from the defendant to the plaintiff and that the defendant's breach of that duty caused the injury for which the plaintiff seeks to recover." Hickingbotham v. Burke, 662 A.2d 297, 301 (N.H. 1995); accord Goodwin v. James, 134 N.H. 579, 583 (1991). "Absent a duty, there is no negligence. Whether a duty exists in a particular case is a question of law." Walls v. Oxford Management Co., 137 N.H. 653, 656 (1993) (citations omitted). I examine the sufficiency of the evidentiary support for his negligence claims.

Sharif alleges that Dean Wallace "should have stepped in to veto separation and to insist that the CSP and Professor Lee

48

Witters allow a make-up exam."  He contends that Dartmouth "failed to observe for the protection of the Plaintiff's interests, that degree of care, precaution and vigilance which the circumstances demanded, whereby Plaintiff suffered loss of his medical career and related damages."  Sharif trips at the first step of the negligence analysis:  he provides no legal or factual basis to establish a duty owed to him by either Dean Wallace or Dartmouth other than the contractual and quasi-contractual duties I have already discussed.  "Where there is no legal duty, there can be no breach of duty, and no finding of negligence."  Sousa v. State, 119 N.H. 283, 285 (1979).

Sharif contends that Dr. Brown and Dr. O'Donnell should have verified the substance of Dr. Brown's letter about his fiancee attending the examination before presenting the letter to the CSP.  Sharif argues that Dr. O'Donnell had a direct or implicit duty to protect him and that Dr. Brown, "[a]s the Director of the Physical Diagnosis Department" had "the essential duty, implicit or otherwise, to verify facts and substantiate hearsay."  He offers no support for a duty owed by either Dr. O'Donnell or Dr. Brown.  Instead, he merely restates his defamation claims in the guise of negligence claims.  As I have previously determined that the evidence does not support his defamation claims, and he has

49

identified no separate duty obligating Dr. O'Donnell or Dr. Brown to investigate the truth of the letter, the negligence claims must also fail. Summary judgment is granted as to all defendants on the negligence claims.

4. Emotional Distress

Sharif alleges claims for both intentional and negligent infliction of emotional distress. He does not assert a negligent infliction of emotional distress cause of action arising from injury incurred by a bystander who witnesses the injury of another, see Corso v. Merrill, 119 N.H. 647, 650 (1979), nor does he allege negligent conduct by particular defendants resulting in emotional distress. Instead, he merely describes his injuries-- emotional distress including a physical condition allegedly caused by the stressful circumstances. As I have granted summary judgment as to Sharif's negligence claims, I find no basis for his claim for negligence damages. See, e.g., Thorpe v. State, 133 N.H. 299, 303 (1990).

To maintain a claim for intentional infliction of emotional distress, Sharif must establish that the defendants "by extreme and outrageous conduct intentionally or recklessly cause[d] severe emotional distress to [him]." Morancy v. Morancy, 134 N.H. 493, 495-96 (1991) (quoting Restatement (Second) of Torts §

50

46 (1965)).  In support of his claim, he states that Dartmouth inflicted "willful harassment and pressure to make Adil 'conform' to some abstruse, provincial standards," Dartmouth "willfully condoned Sarah Henry's deliberate, spiteful and obsessive assassination of Adil's character," the CSP made personal verbal attacks on him, and certain unnamed students and faculty referred him to Dartmouth's "Committee on Impaired Students."  He also faults the CSP members for failing to adequately consider his concern about his mother's health in the decision not to allow a reexamination in endocrinology.  He alleges, "When Plaintiff discussed the issue during his 3/27/91 appeals hearing, Defendants reacted only with a cruel, sadistic stare.  Evidently, their minds were made up and they simply did not care and may have had some sadistic pleasure."

Despite Sharif's colorful pleading, he has offered no evidence of the defendants' intent as to any of his allegations. Also, the actions he describes, stripped of his hyperbole, are neither outrageous nor extreme.  Summary judgment is granted in favor of the defendants on Sharif's emotional distress claims.

5.  Conspiracy

Sharif alleges a separate count of conspiracy against all of the defendants stating that the defendants knew of each others'

51

wrongful conduct, and provided substantial assistance in the conduct.  Specifically, Sharif lists their wrongful conduct as: (1) "usurpation of Dartmouth Medical School's [Handbook provisions] entitled to Plaintiff Adil Sharif"; (2) "wrongful separation and willful destruction of Adil's life-work and dream of serving as a physician--ignoring his passing of the rigorous National Boards Part I on first attempt in June 1991"; (3) "denial of re-examinations in Endocrinology and then also in Gastroenterology--entitled to Adil by Dartmouth bylaws"; (4) "utilization of unsubstantiated hearsay and faculty-student gossip"; (5) "dissemination of these aforementioned false accusations that destroyed Adil's reputation and character in the medical community"; (6) "barring Adil from deliberations -- much less recording deliberations portions of appeals hearings as per DMS bylaws"; (7) "allowing already biased CSP members to vote on final decision to separate on 6/26/91 and previous hearing on 5/8/91"; (8) "besmirch[ing] Adil's transcript with 'separation' inscription"; and (9) refusing to "write Adil letters of recommendation required for transfer admission to any other medical school."

"A civil conspiracy is a combination of two or more persons by concerted action to accomplish an unlawful purpose, or to

52

accomplish some purpose not in itself unlawful by unlawful means." Jay Edwards, Inc. v. Baker, 130 N.H. 41, 47 (1987) (Quotation omitted). However, a cause of action for civil conspiracy cannot survive without an "underlying tort which the alleged conspirators agreed to commit." University System of N.H. v. United States Gypsum Co., 756 F. Supp. 640, 652 (1991). Because I have already determined that the defendants' cited conduct was not wrongful, and thus no underlying tort was committed, Sharif's conspiracy claim must also fail. Summary judgment is granted as to all defendants on the conspiracy claim.

Because I have granted summary judgment in favor of the defendants as to all claims, I decline to reconsider my order denying in part the defendants' motion to dismiss the complaint as barred by the statute of limitations.

## IV. **CONCLUSION**

For the foregoing reasons, defendants' motion for summary judgment (document no. 57) is granted, and plaintiff's motion for summary judgment (document no. 60) is denied. Defendants' motion for reconsideration (document no. 47) is denied as moot in light of this order. Judgment shall be entered in favor of the

53

defendants on all counts.

     SO ORDERED.


                                    _____
                                    Paul Barbadoro
                                    United States District Judge


March 28, 1996

cc:  Edward Haffer, Esq.
     Adil Sharif, pro se